IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

SHAINA M. KIRKLAND,

                Plaintiff,              Case No. 3:19- cv-00312-DCLC-HBG

v.                                      Judge Corker
                                      JURY DEMAND

THE CITY MARYVILLE,

                Defendant.
_____/

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Maryville ignores its own policies and procedures and material facts concerning Shania Kirkland's positive record of job performance, her complaints and the retaliatory treatment she endured after she engaged in protected conduct. Instead, Maryville transparently focuses on largely irrelevant and amplified post hoc characterizations involving Kirkland's demeanor. The reason for this is because the material facts demonstrate that a reasonable jury could conclude Kirkland was retaliated against in violation of her civil rights under state and federal law. Maryville policy protects an employee's right to express their political opinion and make a complaint of discrimination, unfortunately, due to its failure to adhere to its own policies, Kirkland's rights were violated and she was ultimately terminated in retaliation for her assertion of rights. As set forth in greater detail, disputed issues of material fact preclude summary judgment and Maryville's motion must be denied.[1]

### I.      FACTUAL BACKGROUND

---

[1] Kirkland is voluntarily dismissing her Title VII and THRA discrimination/harassment claims, Title IX & PEPFA claims. Thus, the remaining claims are Title VII and THRA retaliation and First Amendment Retaliation.

**City of Maryville and MPD General Orders**

The Maryville Police Department ("MPD") follows the City of Maryville's Personnel Rules and Procedures ("City Rules") and its own policies and procedures referred to as "General Orders." (Crisp Dep. 14-15). The City Rules state in part that no current or prospective City employee "shall be employed, demoted or discharged, or in any way favored or discriminated against **because of political opinion or affiliation**, race, color, religion, national origin, sex, disability, age, or veteran's or reservist's status." (Crisp Dep. 35-36, Ex. 56 p. 000965 (emphasis added)). General Order 2-3 governs recruitment by MPD and contains an Equal Employment Opportunity measure. (Crisp Dep. 18-19, Ex. 48). All complaints of discrimination are to be promptly investigated. (Ex. 56 p. 1010-1011).

MPD Social Media and Political Support Rules: The City Rules recognize an employee may participate in political activities and support or oppose political candidates. (Crisp Dep. 50-51, Ex. 56 p. 001017; Best Dep. 15). General Order 2-10 provides guidelines for the use of social media by MPD members, including personal use of social media. (Crisp Dep. Ex. 49 p. 000477). Specifically, MPD members "are free to express themselves as private citizens while using social media" as long as such expression does not negatively affect the public's perception of MPD and are further cautioned on how their speech and social media activity may reflect upon MPD. (Crisp Dep. Ex. 49 p. 000477).

MPD Grievance Process: General Order 2-14 establishes Grievance Procedures applicable to "points of misunderstanding or disagreement that arise between employees and their supervisors." (Crisp Dep. Ex. 51 p. 000490). Pursuant to General Order 2-14, an employee shall notify his or her immediate supervisor in writing of a grievance. (Crisp Dep. Ex. 51 p. 000490). However, the City Rules set forth complaint procedures regarding discrimination and harassment.

(Crisp Dep. 48, Ex. 56 p. 001010). The City Rules provide that an employee has the right to circumvent the chain of command for discrimination complaints; this provision applies to MPD as well. (Crisp. Dep. 48-49, Ex. 56 p. 001010). However, contrary to policy, Chief Crisp expects all complaints within the MPD to go through the chain of command and ultimately through him rather than to the City's Human Resources Department, even if the employee is uncomfortable talking to him. (Crisp Dep. 16-18).

MPD Disciplinary Rules: General Order 2-15 applies to disciplinary procedures and provides for a range of consequences for failure to follow General Orders ranging in severity from written reprimand to dismissal, depending in part on the class of order violated. (Crisp Dep. 30, Ex. 52). Class C is considered the least serious, with a Class A violation being the most serious and it includes termination. (Crisp Dep. 31, Ex. 52 p. 492). Anything that arises to a "serious complaint" should be referred to internal affairs. (Crisp Dep. 28). If an employee is suspended for less than 5 days, it is a fair assumption that is only a Class C violation. (Crisp Dep. 31).

**Prior to Kirkland's Protected Activity She Was Regarded An Exemplary Officer**

Kirkland transitioned to a full-time police officer position in March of 2013 after starting in a part-time reserve capacity. (Kirkland Dep. 21). In 2014, Kirkland was rated 3-5 ("good" to "excellent") in all categories evaluated with an overall score in the "very good" range after her first year of being a full-time officer. (Crisp Dep. 57, Ex. 58 pp. 1-5). She was regarded as a hard worker, who would "readily volunteer for assignments and regularly turns out more than the normal workload expected of her" (Crisp Dep. Ex. 58 p. 1); and "she is a team player, works well with other officers and continues to be a very good employee with the department. She has also tried to improve herself on a daily basis to become a better officer. She is still in the 'learning'

curve of police work, but has done well in taking advice, etc. from senior officers and supervisors." (Crisp Dep. Ex. 58 p. 5).

Likewise, her 2015 Evaluation contained 4's and 5's in all but one category, with her overall performance marked as "very good". (MSJ Ex. 1, March 28, 2015 Employee Performance/Achievement Expectations). Kirkland was praised for being the "most active officer on day shift" and "approach[ing] her daily routine in a professional manner…[with] a 'can do' attitude." (Id.). Kirkland adapted well to changes in the department and "never questions the decision making process of said changes." (Id.). She served on a committee of officers within the department to identify and address issues and challenges within the department. (Id.). Kirkland received a 5, the top rating, in the teamwork category, with comments that she was very popular amongst her colleagues adapting well to day shift and its members, which her supervisor found "impressive" given that day shift was mostly senior officers within the department. (Id.). The evaluating supervisor stated: "Now, after completing her second year of service and gaining a considerable amount of knowledge and comfort in her job duties, this supervisor would like to see Shaina branch out within the department and assume roles on specialized teams and request more specialized training opportunities to further advance her career." (MSJ Ex. 1).

Again, in 2016, Kirkland scored 3-5 in every category, with an overall score of "very good." (MSJ Ex. 2, March 27, 2016 Employee Performance/Achievement Expectations). Her supervisor commented that she was a "solid officer" on the shift and, praised her written reports, commenting "It is a very rare occasion when I have to request a revision to a report written by Officer Kirkland. She gathers the information required at the scene and writes a very good detailed narrative." (MSJ Ex. 2). It was also noted she "generally gets along with other officers and citizens alike." (MSJ Ex. 2). Kirkland received annual merit raises throughout her employment. (Crisp

Dep. 58-59). In addition to her evaluations, Kirkland was viewed favorably by peers. (Weiss Decl. ¶¶ 3-5; Crisp Ex. 57).

**After Complaining of Gender Discrimination, Kirkland Experiences Retaliation**

In September 2017, Kirkland was acting as a Field Training Officer for a female trainee. (Kirkland Dep. 81-87). In discussing her experience at the department, Kirkland stated she had applied for the Traffic Unit and other special assignments and had been passed over for male officers and made an off-hand comment about uniform boots. (Kirkland Dep. 81-87, Ex. 7 p. 3). Subsequently, on October 10, 2017, Captain Sharon Moore issued a Written Reprimand to Kirkland disciplining her for raising concerns that she was discriminated against based on her gender and the off-hand boot comment. (Moore Dep. 17-22, Ex. 8; Kirkland Dep. 86-87). Specifically, Kirkland was reprimanded for stating MPD "isn't a good department to work for if you are female," and her concern that she had been passed up for special assignments in the past due to her gender; her concerns were characterized as negativity toward the department that would not be tolerated, and she was indefinitely suspended from her duties as a Field Training Officer. (Moore Dep. 21, Ex. 8). Kirkland was warned she was to immediately refrain from speaking negatively about the department and decisions made by the Chief. (Moore Dep. Ex. 8). Chief Crisp confirmed he was made aware that Kirkland made complaints that MPD was not good to work for as a female and perceived she was passed over for special assignments because she was female in 2017. (Crisp Dep. 101-102). Even though the MPD was aware of Kirkland's discrimination concerns, Kirkland was not referred to Human Resources for investigation or counseling due to the discrimination concerns she raised. (Moore Dep. 19, 21).

Throughout her tenure with MPD, Kirkland applied for positions in specialty units which would have been preferable job assignments and extra pay, including the Traffic Unit, which she

applied to at least five times, but was never selected. (Kirkland Dep. 123-124). Crisp estimated the MPD employs probably 6 women out of 59 (10.169%). (Crisp Dep. 81). Officer Weiss experienced similar discrimination that she felt was based on her gender while at MPD. (Weiss Decl. ¶¶ 20, 27-29; Weiss Dep. 70, 86).

**MPD Suspends Officer Kirkland in Retaliation for Expressing her Political Opinion**

In February 2018, Kirkland re-posted a video from a local news station on her personal facebook page of Blount County sheriff candidate, Sheriff Berrong, commenting "Embarrassing!!! This is a leader?? I personally prefer one that can actually speak to people."[2] (Kirkland Dep. 91-95, 9-1). Sometime later, Kirkland posted another picture of a person putting up a political signs for Berrong in which she made a comment about "brainwashed minions." (Kirkland Dep. 97-98). On February 12, 2018, Captain David Graves reprimanded Kirkland for her personal social media post about the County Sheriff because it was "negative" rather than supportive, even though the City's policies specifically protect opposition. (Kirkland Dep. 91-92, Ex. 9-1; Crisp Dep. Ex. 56 p. 1017). Kirkland was the only MPD employee who openly did not support Sheriff Berrong's re-election. (Crisp Dep. 41, 46). The City recognizes in its Policies that employees could publicly oppose political parties and candidates under Tennessee law. (Crisp Dep. 51, Ex. 56 p. 1-17). Although Chief Crisp testified that MPD does not monitor its officers' social media use, he also testified that only Kirkland exclusively was disciplined for her social media use in the last five years. (Crisp Dep. 24, 46).

Nonetheless, on April 20, 2018, Kirkland was still rated in the "good" category with very little additional comment in her performance evaluation. (Crisp Dep. Ex. 58, pp. 10-13). However, it was noted she was working well with her co-workers. (Crisp Dep. Ex. 58, p. 12).

---

[2] Kirkland is employed by the City of Maryville, in its Police Department, which has no relation to the County Sheriff's Department. (Crisp Dep. Ex. 47).

From May 28 to June 1, 2018, Kirkland attended an in-service training at the training academy at the Blount County Sheriff's Office ("BCSO"). (Kirkland Dep. 100-102, Ex. 13). Prior to the training, Kirkland expressed to her supervisor, Captain David Graves, she was concerned about retaliation from some of the sheriff's deputies related the election and her vocal support of the candidate running against Berrong. (Graves Dep. 18). Captain Graves acknowledged Kirkland had let him know about incidents in which Sheriff's deputies Doug Moore and Scotty Boyd got up on her bumper when she was driving. (Graves Dep. 20; Kirkland Dep. Ex. 39). In particular, around February 4, 2018, Scotty Boyd (at the Sheriff's Department) made a comment that people who supported Berrong's opponent were "kool-aid drinking wormy sacks of garbage" and "whiny disgruntled babies." (Kirkland Dep. 176, Ex. 39 p. 0005). On February 7, 2018, Kirkland was directly threatened on a political message board that "bashing the current sheriff is career suicide" and that "you don't burn bridges." (Kirkland Dep. Ex. 39 p. 0006). Despite Kirkland's concerns, Graves did not make any report regarding her complaints of harassment from the Sheriff's deputies and he told Kirkland she had to go to the in-service, but if something was said to her directly to record it with her phone and let him know. (Graves Dep. 18, 20; Kirkland Dep. 181-182). There is no requirement that MPD officers receive in-service training from BCSO. (Moore Dep. 10-11; Kirkland Dep. 186).

On May 29, 2018, while at the BCSO in-service, Kirkland was selected to participate in a training exercise involving a high stress situation requiring rescue of an officer down and ambush by gunfire. (Kirkland Depo. 100-101, Ex. 10; Crisp Dep. 67, Ex. 13). In the exercise, where all trainees were wearing simunition helmets, Kirkland was selected to be the driver of an SUV during the exercise and other officers were yelling at her to "go, go, go;" while the trainee playing the part of the downed suspect was lying in front of the SUV being driven by Kirkland. (Ex. 13). It

was then reported this person lying in front of the SUV was almost run over. (Kirkland Dep. Ex. 13). Despite being yelled at to "go, go, go" Kirkland stopped the SUV when instructors commanded her to do so and no one was harmed. (Id; Crisp Dep. 67).

Then, while at the same in-service, on June 1, 2018, Investigator Paul Grady of BCSO was greeting the officers in attendance by shaking hands and extended his hand to Kirkland who responded by saying "No, thank you" and did not shake his hand. (Kirkland Dep. 105, Ex. 11). Kirkland did not shake his hand because of the way she perceived she was being treated at the training by BCSO deputies and Grady's social media behavior that she found offensive. (Kirkland Dep. 181-182, Ex. 13, p. 2). Grady was subsequently asked to send a memo to Sheriff Berrong on June 4, 2018, documenting the incident with Kirkland.[3] (Kirkland Dep. 105, Ex. 11; Berrong Dep. 12-13; Crisp Dep. Ex. 12). On June 4, 2018, Sheriff Berrong advised Chief Crisp that Kirkland was no longer welcome at training held by BCSO because she declined to shake Grady's hand and the training exercise where she was accused of handling herself in an "unsafe manner." (Crisp Dep. 64-65, Ex. 12 p. 2; Berrong Dep. 12-13). Crisp recalls having a discussion with Berrong about the decision to not let Kirkland attend future trainings, but Berrong has no such recollection. (Crisp Dep. 65; Berrong Dep. 18). Berrong stated that because Kirkland was "coming into their house" for training, she was blatantly disrespectful when she declined to shake hands. (Berrong Dep. 17). No other officers were disciplined for the training exercise. (Berrong Dep. 11). However, Berrong was certain other officers have almost been injured in training exercises and could not recall another officer being banned from training. (Berrong Dep. 13).

Although MPD has no "hand shaking policy" (nor would they, since such would likely be ridiculous), Chief Crisp expects MPD officers to shake hands any time someone extends a hand to

---

[3] There is no evidence Grady was offended. To the contrary his memo states that "someone other than me" reported the incident to Lt. Garner who then requested a report on it. (Ex. 11).

be shaken. (Crisp Dep. 63. *C.f.* Best Dep. 15 (does not recall any other City employee being suspended for not shaking a hand)). Chief Crisp made the decision to suspend Kirkland without asking with her why she refused to shake Grady's hand. (Crisp Dep. 65-66).

On June 8, 2019, after investigating the incidents involving Kirkland at the BSCO training, Captain Moore recommended reprimand because it was a dangerous situation and based on the "totality of the situation" a three-day suspension without pay was recommended. (Crisp Dep.67; Moore Dep. 29-30, 32, Ex. 13 p. 2). In doing so, Moore brought up Kirkland's political opinions on her social media account and the 2017 reprimand where Kirkland complained about the way female officers were treated. (Moore Dep. Ex. 13).

On June 26, 2018, Chief Crisp sent his recommendation to suspend Kirkland without pay to Assistant City Manager Roger Campbell due to Kirkland's "attitude and ability to get along with others," her "blatant disrespect for [BCSO's] instructors and deputies" and handling herself in an unsafe manner in the training exercise. (Crisp Dep. 71, Ex. 14). Noticeably, rather than it just being a declination to shake one person's hand, she was accused of "disrespect" to multiple "instructors and deputies" in the plural, despite no facts to support wide-spread disrespect. (Id.). Further, Crisp recognized that even though there is a policy that contains a procedure for resolving problems with personnel of other agencies, he did not meet with Berrong about Kirkland because he did not feel it rose to the level of a serious policy or procedural problem. (Crisp Dep. 34). Crisp believed he only had a verbal counseling with another employee for similar behavior, but he could not recall for certain. (Crisp Dep. 54).

Kirkland was subsequently provided notice of a pre-disciplinary hearing, which was attended by Chief Crisp. (Crisp Dep. 73, Ex. 16). Kirkland spoke to Teresa Best, Human Resources Director, regarding the discipline procedure, and per Best, Kirkland expressed concern that she

would not get a fair hearing because the Assistant City Manager and Chief Crisp played golf together. (Best Dep. 12). On July 11, 2018, Campbell upheld the recommendation for a three-day suspension without pay and Kirkland was notified of her appeal rights to the City Manager. (Crisp Dep. 75, Ex. 16). Subsequently, on July 18, 2018, City Manager, Greg McClain, upheld the 3 day suspension for disrespect, but dismissed the allegation concerning the training exercise unconvinced that any other officer would have reacted differently. (McClain Dep. Ex. 17). Kirkland was suspended without pay July 23-26, 2018 for the non-serious hand shaking incident. (Kirkland Dep. Ex. 18; Crisp Dep. 34).

**Officer Kirkland Notifies the City Manager of her Discrimination Claims**

Finally, with the writing on the wall that MPD was going to continue its pattern of discrimination and retaliation, on July 22, 2018, Kirkland sent a memo to Greg McClain, City Manager, and Teresa Best advising City administration of her "Discrimination Claims." (Kirkland Dep. Ex. 19; Best Dep. 16 (can't recall receiving); McClain Dep. 22-23 (recalls giving to Best); Crawford Dep. 17 (saw when transitioning to Best's role)). In her Memo, Kirkland expressed her belief that she had been discriminated against on the basis of her gender, setting forth in detail her multiple applications to the traffic unit, request for the rank of Corporal, application for the Fifth Judicial Drug Task Force, try out for the SWAT team, the 2017 reprimand where she spoke out about females being treated differently, inappropriate notes left in her mailbox, and the BCSO training week incidents, including that she had brought issues of retaliation to Captain Graves' attention to no avail. (Ex. 19). All of which led Kirkland to conclude she was being subjected to a hostile work environment and expressed her belief that she was being retaliated against for talking about discrimination. (Ex. 19).

On July 26, 2018, Kirkland filed an EEOC Charge alleging discrimination and retaliation. (Best Dep. Ex. 59). On September 19, 2018, Kirkland sent an additional email to McClain and Crawford titled "update to discrimination claims."[4] (Kirkland Dep. Ex. 23). Kirkland informed McClain of further discrimination regarding SWAT tryouts, expressing a claim that she was not timely informed of the tryout information despite signing up for it and retaliation in the wake of her EEOC charge. (Kirkland Dep. Ex. 19, 23). On August 9, 2018, Kirkland discovered she had not received a letter with information for the SWAT tryouts scheduled for August 18, 2018, and followed up with her supervisor, Lt. Davis, who told informed Kirkland she was not eligible for SWAT tryouts due to the recent suspension. (Kirkland Dep. Ex. 19). Kirkland showed Davis the General Orders on discipline and SWAT qualifications, which did not contain any indication she would be ineligible. (Ex. 19). Kirkland informed her immediate supervisor, Sgt. Porter, that she was the only female to sign up and the only individual not permitted to try out. (Ex. 19). On August 14, 2018, Davis finally provided Kirkland the information about SWAT tryouts and told her she could tryout if she was still interested. (Ex. 19). Kirkland was still scheduled to work on the same day as the tryouts and did not think it would be safe to go through the tryout then work a full shift, so she was unable to attend tryouts; however, two men on her shift who tried out were not scheduled to work the date of tryouts. (Ex. 19). In her update to McClain and Crawford, Kirkland made them aware that other officers had been warned about dealing with her because she had filed a lawsuit (even though she had not at that time). (Ex. 19 p. 0089).

**The City Fails to Investigate Kirkland's Discrimination, Harassment and Retaliation Complaints and Contrary to Policy Hands it Back Over to MPD to Handle as a "Grievance"**

---

[4] Crawford was Best's successor as HR Director; Best retired from the City around the first of August 2028, but to this day she still performs contract work for them. (Best Dep. 6-7; Crawford Dep. 7).

The City completely dropped the ball on Kirkland's discrimination complaints and did not take any steps to investigate her claims; instead, she was eventually directed back to the MPD, the very department she complained about, to use the department's grievance procedure that Crisp oversaw. (McClain Dep. 17; Best Dep. 15-17; Crisp Dep. 78-80). McClain claims he asked Teresa Best of Human Resources to get involved when he received Kirkland's discrimination complaint to make sure they were following internal processes. (McClain Dep. 17). According to McClain, discrimination claims go to Human Resources for determination. (McClain Dep. 22). Best, the HR Director, testified that the City Manager (Mr. McClain) would most likely assign who should investigate a discrimination claim. (Best Dep. 9). McClain ultimately does not know if anyone conducted an investigation or spoke to Kirkland regarding the complaints she sent to him. (McClain Dep. 23). McClain claims Best determined the complaint needed to go through the MPD grievance process and recalls Best reporting she was talking to Chief Crisp and they were working on it together. (McClain Dep. 25-26). However, Best testified she would have looked to McClain's direction and does not recall being instructed to look into the complaint. (Best Dep. 17). Best does not have any recollection of reviewing Kirkland's memo to McClain and does not know if she ever received her complaint of discrimination. (Best Dep. 16). Crawford (Best's successor as HR Director) recollects that she, along with Campbell, determined Kirkland's September 19, 2018 email was to be filed as a grievance with MPD. (Crawford Dep. 39). Campbell, however, has no recollection of ever seeing the memo Kirkland sent McClain. (Campbell Dep. 16). Crawford testified that Kirkland's email, titled "update to discrimination claims" was not part of the discrimination claims already made; however, she acknowledged that Human Resources is supposed to investigate discrimination claims filed with the City. (Crawford Dep. 14). Further, contrary to Crisp's dictate, Crawford acknowledged the grievance policy was not to be used for

complaints of discrimination. (Crawford Dep. 15, 62; Crisp Dep. 29). But, Crawford did inform Kirkland that her discrimination complaints regarding SWAT tryouts fit into the grievance policy. (Crawford Dep. 15-16). Due to concerns of retaliation, Kirkland did not start the grievance process at that time because she was fearful she would lose her job. (Crawford Dep. 24, 52, Ex. 60).

Contrary to Policy, the City did not conduct **any** formal investigation of Kirkland's complaints of discrimination following her September 22, 2018 email to McClain. (Ex. 56 pp. 1010-11). Crisp testified that neither City Manager Greg McClain, nor anyone from Human Resources came to him to investigate Kirkland's complaints. (Crisp. Dep. 84-85). Crisp acknowledged receipt of Kirkland's memos to McClain but, did not ask anyone to investigate her allegations. (Crisp Dep. 84-85). Moreover, Crisp testified that Kirkland violated General Order 2-14 by filing a grievance of discrimination with the City's Human Resources Department rather than following chain of command. (Crisp Dep. 29, Ex. 51, Ex. 58 p. 16 (4/20/19 rated below job standards for not following grievance procedures)). However, when brought to his attention, Crisp agreed that per City Policy an employee can circumvent their chain of command. (Crisp Dep. 49, Ex. 56 p. 1010).

The City Policy states that they will promptly investigate claims of discrimination. (Best Dep. 18-19; Ex. 56 pp. 1010-11). McClain acknowledges it would be a violation of the City's policies if Kirkland's claim was dropped and nothing was done with it. (McClain Dep. 35). He further admitted that if nothing happened within a six month period after Kirkland's complaints that such inaction would not be appropriate. (McClain Dep. 36). Best does not know if Kirkland's claims were investigated, in part because she was in the process of retiring, although she did hand the file off to Crawford.[5] (Best Dep. 6-7, 19, 24; Crawford 7-8). Campbell testified the City has a

---

[5] Crawford has no experience investigating complaints of discrimination. (Crawford Dep. 8).

form for investigation documentation. (Campbell Dep. 17). If Human Resources investigated Kirkland's discrimination claims, there should be documentation in the City's files, but there was none, and the City failed to produce the form. (Campbell Dep. 17).

On January 23, 2019, Kirkland filed a grievance with MPD, since the City ignored her initial discrimination complaint. (Crisp Dep. 85-86, Ex. 24). McClain admitted that the grievance was the result of the initial complaint of discrimination Kirkland sent to him that Human Resources failed to investigate. (McClain Dep. 44). Human Resources did not investigate the grievance alleging discrimination, harassment, hostile work environment, and retaliation, although pursuant to City Rules, such complaints were outside the grievance policy and should be investigated by Human Resources and the City Manager. (Crawford Dep. 56; 59). To her credit, Crawford, doubted the appropriateness of Chief Crisp investigating the claims, including discrimination claims, against him and the police department that were raised in Kirkland's grievance. (Crawford Dep. 57). According to Crawford, a supervisor would not investigate a complaint of which they are the subject. (Crawford Dep. 15). While Chief Crisp was not the subject of the grievance, the allegations of discrimination were against the MPD, of which he is the head. (Crawford Dep. 57-59). Nonetheless, upon receipt of the grievance, Crisp did not start any investigation and did not refer it to internal affairs or HR. (Crisp Dep. 86-87). Instead, based on his first-hand knowledge of everything in Kirkland's grievance, on January 31, 2019, Crisp determined her allegations were without merit. (Crisp Dep. 87-88, Ex. 25). Crisp made his determination within a few days of receipt concluding "there are perceptions and reality. Although you perceive that you have been discriminated against, it is my opinion that the facts aren't present to back up this allegation" even though he admitted he did not conduct an investigation, nor did HR. (Crisp Dep. 87, Ex. 25).

**Kirkland is Terminated in Retaliation for Making Complaints of Discrimination.**

On May 16, 2019, barely four months after dismissing her discrimination complaints without investigation, Crisp recommended Kirkland's termination in a Memo to Assistant City Manager Campbell. (Crisp Dep. 94, Ex. 33). Crisp stated that on May 13, 2019, it was brought to his attention by a MPD employee that Kirkland made a derogatory comment on her personal Facebook account. (Crisp Dep. 92, 94, Ex. 33). Kirkland reposted a newspaper article about Sheriff Berrong, in which it was noted he had connections to a private contractor and commented, "Just like I'm sure it's not illegal to ban a female officer from training, for not voting for you either." (Crisp Dep. 94, Ex. 32, 33; Kirkland Dep. 160). Upon receiving the complaint, Crisp sent Kirkland home while he considered how to handle the situation given that she had not changed her attitude as he had previously instructed. (Crisp Dep. 94, 96-98). HR, who had not been involved in a social media related termination, was not involved in the decision, only Crisp. (Crawford Dep. 40). On May 16, 2019, Kirkland received a memo from Campbell regarding a pre-disciplinary hearing due to Crisp's recommendation of termination. (Campbell Dep. Ex. 34). On May 20, 2019, Campbell upheld Kirkland's termination. (Campbell Dep. 22, Ex. 35). Kirkland appealed the decision to City Manager McClain, who held a hearing on May 28, 2019. (McClain Dep. 42). McClain upheld the termination that same day. (McClain Depo 46, Ex. 36). McClain did not consider whether other employees made similar posts on social media but, acknowledged he has not been involved in any other discipline or termination based on employee's social media activity. (McClain Dep. 49). McClain also acknowledged (after being corrected) that City Policy governs over departmental procedure if there is conflict. (McClain Dep. 50-51, Ex. 56 p. 1035). Crisp conceded that Kirkland was not ever referred to internal affairs for a serious complaint. (Crisp Dep. 27). Prior to her termination, Crisp announced in a supervisor meeting that Kirkland had filed a complaint of discrimination with a federal agency and they were expecting a lawsuit. (Graves Dep. 15-16).

Kirkland suffered further retaliation by MPD after her termination. She applied for law enforcement jobs at multiple agencies. (Kirkland Dep. 47-48). Despite the City's practice to only verify dates of employment and title through the Human Resources Department, Crisp spoke to a member of at least one police department regarding Kirkland dissuading them from hiring her for her protected activity. (Crisp Dep. 21-23; McClain Dep. 57; Best Dep. 26-27; Crawford Dep. 43). For example, Crisp informed the Venore Police Department that Kirkland had been terminated and that she had filed a lawsuit against him. (Crisp Dep. 21-23). McClain acknowledged they did not give details like this because it risks the City to litigation and injures someone's opportunity to find a job. (McClain Dep. 57). Similarly, after raising concerns of bias and discrimination, Officer Weiss experienced retaliation as well. (Weiss Decl. ¶¶14, 19, 23; Weiss Dep. 55, 57-58).

## II.     SUMMARY JUDGMENT STANDARD

Under Rule 56, "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 150-151 (2000). "Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Id.*, 530 U.S. 133, 150-51. "The evidence of the nonmovant is to be believed." *Anderson v. Liberty Lobby, Inc.,* 477 U. S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). Summary judgment should not be imposed to deny a party an opportunity to present a meritorious claim or defense on his/her "day in court." *Smith v. Hudson*, 600 F.2d 60, 63 (6th Cir. 1979).

## III. ARGUMENT

## A. A Reasonable Jury Could Conclude There are Disputed Issues of Fact that The City Retaliated Against Officer Kirkland in Violation of Title VII, the THRA, and the First Amendment

A plaintiff may establish a retaliation claim by offering indirect proof of retaliation under the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 1824, 36 L. Ed. 2d 668 (1973).[6] "The burden of establishing a *prima facie* case of retaliation *is not onerous, but one easily met.*"[7] *EEOC v. Avery Dennison Corp.,* 104 F.3d 858, 861 (6th Cir. 1997). At the prima facie stage, Kirkland is not required to prove her underlying case of discrimination or allege specific facts pertaining to discriminatory statements. *See White v. Burlington Northern & Santa Fe Ry.*, 364 F.3d at 64, 67 (the antiretaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment, thus rejecting decisions that have treated the antiretaliation provision as forbidding the same conduct prohibited by the antidiscrimination provision).

After offering a legitimate non-retaliatory reason for the adverse action, plaintiff offers facts to support the adverse action was pretext for unlawful retaliation. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802. A plaintiff may demonstrate pretext by showing: (1) the proffered reason has no factual basis; (2) the reason did not actually motivate the decision; or (3) the articulated reason is insufficient to justify the adverse action taken. *Wexler v. White's Fine Furniture,* 317 F.3d 564, 576 (6th Cir. 2003) (en banc). *See Willard v. Huntington Ford, Inc.*, 952

---

[6] Title VII and THRA claims are analyzed the same. *Chattman v. Toho Tenax Amer.,* Inc., 686 F.3d 339, 346 (6th Cir. 2012) (analyzing THRA claims under the Title VII standard); *Mullins v. Goodyear Tire & Rubber Co.*, 291 Fed. Appx. 744, 745 n.1 (6th Cir. 2008) ("The THRA is a state law analogous to Title VII and the statutes are analyzed identically.").

[7] In order to establish a prima facie case of retaliation, a plaintiff must establish that: (1) she engaged in activity protected by Title VII/THRA; (2) the exercise of her civil rights was known to the defendant; (3) thereafter, the defendant took an employment action adverse to the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action. *Harrison v. Metropolitan Gov't,* 80 F.3d 1107, 1118 (6th Cir. 1996). *Accord Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 512, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002) ("the precise requirements of a prima facie case can vary depending on the context and were 'never intended to be rigid, mechanized, or ritualistic'").

F.3d 795, 811 n.10 (6th Cir. 2020) (noting that the "three-part test" for pretext should not be treated "rigidly"). Here, the City only contests the elements 3 (adverse action) and 4 (causation) of the easily met prima facie test. (MSJ Memo. p. 17-19). The City does not argue that Kirkland is unable to establish pretext and without doing so, that argument is waived. Nonetheless, Kirkland sets forth the facts that establish pretext.

1. **The City Retaliated Against Officer Kirkland in Violation of Title VII & THRA**

   a. **Kirkland Can Establish the Easily Met Prima Facie Adverse Action and Causal Elements**

Close temporal proximity alone can establish causation. *Zanders v. National R.R. Passenger Corp.,* 898 F.2d 1127, 1135 (6th Cir. 1990) (the causal link element requires "merely that the plaintiff establish that the protected activity and the adverse action were not wholly unrelated."); *Judge v. Landscape Forms, Inc.*, 592 Fed. Appx. 403, 2014 U.S. App. LEXIS 22372 *5 (6th Cir. Nov. 21, 2014) (citing *Seeger* and observing that "the causal connection between the protected activity and the adverse employment action necessary for a prima facie case of retaliation can be established solely on the basis of close temporal proximity"); *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 563 (6th Cir. 2004) (holding that a three-month gap between the protected action and the alleged retaliatory discharge supports an inference of causation based on temporal proximity alone). "But where some time elapses" between the employee's protected activity and the adverse employment action, "the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality." *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008); *see also Hamilton v. Gen. Elec. Co.*, 556 F.3d 428, 435 (6th Cir. 2009).

**ADVERSE ACTION**: Whether a given employment event was an "adverse employment action" is a question of fact for the jury to decide. *See Lentz v. City of Cleveland*, 333 F. App'x 42,

57 (6th Cir. 2009) ("[W]here the law does not clearly indicate whether the undisputed facts concerning an employer's conduct render the conduct an adverse employment action, a judge must allow the jury to decide whether an adverse employment action has occurred."). The City rightly admits that Kirkland's suspension without pay and termination are adverse employment actions. (MSJ Memo. 17-18). *Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53, 67, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006); *Smith v. City of Salem, Ohio*, 378 F.3d 566, 576 (6th Cir. 2004) (a 24-hour suspension, the equivalent of three eight-hour work days, was an adverse employment action). However, the City contests that the suspension without pay was unrelated to Kirkland's protected activity. This is not true, in 2017, Kirkland was reprimanded and relieved of her FTO duties indefinitely in part because she complained about the way females were treated.[8] (Moore Dep. 21, Ex. 8). This complaint by Kirkland was re-hashed and made a part of her 2018 reprimand and unpaid suspension and later characterized as the "totality" of Kirkland's behavior. (Moore Dep. Ex. 13). Thus, Kirkland can satisfy this easily met element.

**CAUSAL CONNECTION**: There is a causal connection between both the adverse action and Kirkland's protected activity as evidenced by the temporal proximity, increased general hostility toward her, and that Kirkland was reprimanded in part for her "negativity" by saying the department was not a good place to work if you were female, and then by continuing to hold her complaint and perceived negativity and attitude against her, even after she submitted a two discrimination complaints to HR, and grievance expressing elements of discrimination and retaliation to HR and an EEOC charge, none these complaints of discrimination and retaliation

---

[8] "A reassignment without salary or work hour changes . . . may be an adverse employment action if it constitutes a demotion evidenced by a less distinguishable title . . . significantly diminished material responsibilities, or other indices that might be unique to a particular situation. *Burlington Northern*, 364 F.3d at 797; *Kocsis v. Multi-Care Management*, 97 F.3d 886 (6th Cir. 1989)). A reassignment which results in "a less distinguished title" may be considered an adverse employment action. *Rodgers v. City of Cleveland*, No. 1:05 CV 2349, 2006 U.S. Dist. LEXIS 60574 at *13 (N. D. Ohio Aug. 14, 2006). A reassignment entailing a loss of prestige is sufficient. *Id*.

were taken seriously or investigated per City Policy. (Moore Dep. 19, 21; McClain Dep. 17; Best Dep. 15-17, Ex. 56 p. 1010-1011; Crisp Dep. 78-80). This hostility is further exhibited by the fact that Kirkland had no disciplinary history about "unbecoming conduct," until after the 2017 incident where she commented the MPD was not a good place to work if you were female. (Kirkland Ex. 7, 8). *See Delisle v. Brimfield Twp. Police Dep't*, 2004 U.S. App. LEXIS 4598, *24-25, 94 Fed. Appx. 247, 255 (6th Cir. Ohio Mar. 8, 2004) (Plaintiff established a prima facie case of retaliation through both temporal proximity and other evidence of hostility exhibited through performance issues close in time to his informal complaints of discrimination where no meaningful performance issues existed in his former work history). Moreover, heightened scrutiny after the engaging in protected conduct, like filing an EEOC charge, establishes sufficient causal nexus that retaliation occurred. See *Hamilton v. GE*, 556 F.3d 428, 435 (6th Cir. 2009). *See Braun v. Ultimate Jetcharters, LLC,* 2016 U.S. App. LEXIS 12559 *23 (6th Cir. July 8, 2016) (temporal proximity coupled with plaintiff's testimony she did not commit the error complained of was sufficient to establish causation). Here, Kirkland filed her EEOC charge, but then she makes a Facebook post about being banned as a female officer from training and is terminated for it instead. (Crisp Dep. 94, Ex. 33). MPD completely eschews its duties to provide a workplace free from discrimination. Not seeing the forest for the trees, MPD only saw what it perceived to be an insubordinate Facebook post, which per policy she had every right to make. (Ex. 56 pp. 1010-11, 1017). Thus, the easily met element of causation is established.

### b. The City's Actions Were Pretext for Retaliation

Kirkland seeks to establish pretext under the second or third method of proof, *i.e.*, that the reasons proffered by MPD did not actually motivate the disciplinary actions Kirkland experienced and that the allegations taken against her were insufficient to motivate the disciplinary actions she

experienced. The Supreme Court has cautioned that pretext need not "virtually jump off the page and slap you in the face" and indeed such rigor is not necessary and is "unhelpful and imprecise." *Ash v. Tyson Foods, Inc.,* 546 U.S. 454, 456-458 (2006). In this case, there are multiple examples of circumstantial evidence that establish pretext:

- In 2017, immediately after commenting the department was not a good place to work if you were female, Kirkland was reprimanded. (Moore Dep. 21, Ex. 8). Kirkland's complaints about discrimination were not investigated. (Moore Dep. 19, 21).

- All complaints of discrimination made by City employees are to be promptly investigated. (Ex. 56 p. 1010-1011). Kirkland's were not. (Crisp. Dep. 84-85; Best Dep. 6-7, 16, 19, 24; Crawford 7-8; Campbell Dep. 16; McClain Dep. 23).

- Kirkland was not provided information about SWAT tryouts after her complaint; other employees were warned about dealing with her due to "her lawsuit" [EEOC charge]; and she was subsequently not given time off like other officers to attend the SWAT try-outs. (Ex. 19). *See Evans v. Prospect Airport Servs., Inc.,* 286 F. App'x 889, 895 (6th Cir. 2008) (unpublished) ("[b]eyond temporal proximity, other indicia of retaliatory conduct would include evidence that the plaintiff was treated differently . . . than similarly situated employees who had not exercised Title VII rights…") (citing *Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1080 (6th Cir. 1990)).

- The reason for Kirkland's termination directly relates to protected conduct where Kirkland reposted a newspaper article about Sheriff Berrong, in which it was noted he had connections to a private contractor and commented, "Just like I'm sure it's not illegal to ban a female officer from training, for not voting for you either." (Crisp. Dep. 94, Ex. 32, 33; Kirkland Dep. 160).

- Kirkland was removed indefinitely from her FTO duties in large part due to expressing her concerns about gender discrimination at the MPD. (Moore Dep. 36, Ex. 13; Kirkland Dep. Ex. 7, 8). *Burlington Northern*, 364 F.3d at 797; *Kocsis v. Multi-Care Management*, 97 F.3d 886 (6th Cir. 1989); *Rodgers v. City of Cleveland*, No. 1:05 CV 2349, 2006 U.S. Dist. LEXIS 60574 at *13 (reassignment which results in "a less distinguished title" may be considered an adverse employment action).

- MPD's pattern of disciplinary write-ups only started *after* Kirkland engaged in protected conduct is ample evidence for a jury to determine the actions taken against Kirkland are pretext for retaliation. (Kirkland Dep. Ex. 7, 8, 13, 19 p. 0066, 23, 24, 26, 32, 33). *Hubbell v. FedEx SmartPost, Inc.*, 2016 U.S. Dist. LEXIS 75138 *45 (E.D. Mich. June 9. 2016) (plaintiff offered evidence that management harassed her in other ways, such as by giving her unwarranted disciplinary write-ups, these other acts showed an issue of fact that defendant bore substantial animus towards plaintiff after she engaged in protected conduct). *See Harrison v. Metropolitan Gov't of Nashville & Davidson Cty.*, 80 F.3d 1107, 1119 (6th Cir. 1996), *overruled on other grounds as recognized by Jackson v. Quanex Corp.*, 191 F.3d 647, 667 n. 6 (6th Cir.1999) (finding that the plaintiff's retaliation claim was supported in part by evidence showing that there was "an atmosphere in which the

plaintiff's activities were scrutinized more carefully than those of comparably situated employees . . . and that the [employer] took every opportunity to make his life as an employee unpleasant").

- MPD brought up Kirkland's 2017 reprimand where Kirkland complained about the way female officers were treated again when she was reprimanded in 2018, thus, clearly that complaint continued to be an issue for MPD management. (Moore Dep. 36, Ex. 13).

- Crisp admitted that Kirkland's discipline fell into the "less serious" category supported by the fact it was not referred to internal affairs. (Crisp Dep. 27-28, 34, Ex. 31).

- Prior to raising issues of gender discrimination, Kirkland's evaluations reflected that she was a good to excellent officer. (Crisp Dep. 57, Ex. 58; MSJ Ex. 1; MSJ Ex. 2).

- Crisp is regarded as behaving in a retaliatory fashion by other employees. (Weiss Decl. ¶¶14, 19, 23; Weiss Dep. 55, 57-58) (*Harrison v. Metropolitan Gov't of Nashville & Davidson Cty.*, 80 F.3d 1107, 1119 (6th Cir. 1996) (fear of retaliation by other employees is an indicia of retaliation).

- After complaining of gender discrimination, and in stark contrast to her prior evaluations, Kirkland was accused of negativity and warned about her "attitude." (Kirkland Dep. Ex. 7, 8, 13, 33 p. 2). Further, the fact that the 2017 incident resurfaced in conjunction with her 2019 termination demonstrates that protected activity continued to play a prominent role. *Id. Yazdian v. ConMed Endoscopic Techs., Inc*., 793 F.3d 634, 648, 652 (6th Cir. 2015)[9] (*citing e.g., Tomasso v. Boeing Co.*, 445 F.3d 702, 706 (3d Cir. 2006) ("As we have noted, low evaluation scores may be a pretext for discrimination, especially where, as here, an employer uses subjective criteria such as 'attitude' and 'teamwork' to rate its employees.").

Kirkland need not prove an underlying case of discrimination to show retaliation. *See White v. Burlington Northern & Santa Fe Ry*., 364 F.3d at 64, 67 (rejecting decisions that have treated the antiretaliation provision as forbidding the same conduct prohibited by the antidiscrimination provision). Thus, given the many reasons set forth which a reasonable jury could use to determine

---

[9] *Yazdian v. ConMed Endoscopic Techs., Inc*., 793 F.3d 634, 652 (6th Cir. 2015):
There is a difference, however, between a refusal to follow an order and an assertion that an employee was "rude" or "defiant." Indeed, there may be some instances when the allegedly insubordinate act may be a response to a sort of unspoken, subliminal discrimination in the workplace. For example, a woman who takes a strong position may be considered "pushy," whereas a man who does the same is "assertive." One manager may call a black man "aggressive" and a white man "passionate" for the same speech. These are just a few examples of how subjective these adjectival labels can be. And whether these adjectives are evidence of discrimination or are legitimate grounds for termination requires examining the words in context and the demeanor of the speakers—**quintessential jury functions**. (emphasis added).

Kirkland's termination was pretext for retaliation, she has satisfied her burden and the City's motion must be denied.

## 2. The City Retaliated Against Officer Kirkland in Violation of her First Amendment Rights

A cause of action for First Amendment retaliation requires an employee to demonstrate that: "(1) she engaged in constitutionally protected speech or conduct; (2) an adverse action was taken against her that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two — that is, the adverse action was motivated at least in part by her protected conduct." *Mills v. Williams*, 276 F. App'x 417, 418 (6th Cir. 2008) (citing *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 255 (6th Cir. 2006)). A public employee's speech is constitutionally protected if (1) in making the speech, the employee was speaking as a citizen, and not as a public employee acting in furtherance of his ordinary responsibilities; and (2) the speech was on a matter of public concern. *See Boulton v. Swanson*, 795 F. 3d 526, 531-32, 534 (6th Cir. 2015). A public employee is not speaking as a citizen when he "make[s] statements pursuant to [his] official duties." *Garcetti v Ceballos*, 547 U. S. 410, 421 (2006). The *Garcetti* exception is to be construed narrowly. *Lane v. Franks*, 573 U.S. 228, 134 S. Ct. 2369, 189 L. Ed. 2d 312 (2014). In *Lane,* the Court determined:

> *Garcetti* said nothing about speech that simply relates to public employment or concerns information learned in the course of public employment… the mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen— speech…the critical question is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties.

*Id.* at 239. Speech involves matters of public concern "when it can 'be fairly considered as relating to any matter of political, social, or other concern to the community,' or when it 'is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the

public.'" *Snyder* v. *Phelps*, 562 U. S. 443, 453, 131 S. Ct. 1207, 1211, 179 L. Ed. 2d 172, 176 (2011).

Complaints about discrimination have been determined to plainly fall within the ambit of speech about matters of public concern. *Perry v. McGinnis*, 209 F.3d 597, 608 (6th Cir. 2000) (citing *Connick v. Myers*, 461 U.S. 138, 148 n.8, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983)). Use of a term of art like "hostile work environment" or the like, *e.g.* discrimination, is indicative an employee is engaging in protected activity complaining of discrimination based on a protected class. *See Yazdian v. ConMed Endoscopic Techs., Inc*., 793 F.3d 634, 646 (6th Cir. 2015). Courts have recognized posting on Facebook is a form of First Amendment activity. *See, e.g., Meadows v. Enyeart*, 627 F. App'x 496, 503 (6th Cir. 2015).

The City appears to make several contentions with respect to Kirkland's First Amendment retaliation claim: (1) whether her speech touched on a matter of public concern rather than just a "personal conflict" (MSJ Memo. p. 11-12); (2) that her speech was "false" (MSJ Memo. p. 12); (3) that her the "totality of events" justifies her termination over her First Amendment rights (MSJ Memo. p. 13); all of these arguments fail.

**PUBLIC CONCERN**: Kirkland spoke out on an issue of public concern, namely discrimination, as well as expressing her preference for an elected official in the county in which she lives. (Kirkland Dep. Ex. 32). *Sowards v. Loudon County, Tennessee*, 203 F.3d 426, 432 (6th Cir. 2000) (The right of political association is a "well-established right" because "political belief and association constitute the core of those activities protected by the First Amendment."). The City admits that her vocal opposition on her Facebook page about Berrong, a person who was not in her chain of command, was a triggering issue for her termination. (Crisp Dep. 94, Ex. 32, 33, 34; Kirkland Dep. 160). Indeed, the triggering post was directly related to Kirkland's perception

that she was banned from training because she did not support Berrong and was a female. (Crisp Dep. Ex. 33). To determine whether speech was made as a private citizen, courts consider "the impetus for her speech, the setting of her speech, the speech's audience, and its general subject matter." *Handy-Clay v. City of Memphis, Tenn.*, 695 F.3d at 540 (internal citation and quotations omitted). Courts also consider whether the statements were made up the chain of command, or "whether the content of the speech is nothing more than the quintessential employee beef: management has acted incompetently." *Id.* (quoting *Haynes v. City of Circleville, Ohio*, 474 F.3d 357, 365 (6th Cir. 2007)). "Public interest is near its zenith when ensuring that public organizations are being operated in accordance with the law." *Marohnic v. Walker*, 800 F.2d 613, 616 (6th Cir. 1986) (*per curiam*). Speech involving matters of public concern include speech protesting racial or sexual harassment or discrimination within a public organization. *Hughes v. Region VII Area Agency on Aging*, 542 F.3d 169, 182 (6th Cir. 2008) (citations omitted). Here, Kirkland was using her personal Facebook page to re-post a public newspaper article and relayed her experience of discrimination and retaliation at the Sheriff's office. Not only is discrimination and retaliation a matter a public concern, but Kirkland is not a BCSO employee, she has every right to speak about her experience at BCSO even though her experience was acquired by virtue of her public employment. *See v. City of Elyria*, 502 F.3d 484, 492 (6th Cir. 2007) (public employees are the most likely to be informed of the operations of public employers and that the operation of such entities is "of substantial concern to the public."). It simply cannot be argued that speech Kirkland made was within the scope of her job duties, but clearly her speech was a matter of public concern. *Lane v. Franks*, 573 U.S. at 239; *Rankin v. McPherson*, 483 U.S. 378, 387, 107 S. Ct. 2891, 97 L. Ed. 2d 315 (1987) ("The inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern").

**THE FALSITY OF ALLEGATION IS AN INVALID ARGUMENT**: Assuming *arguendo* Kirkland made a false statement, false statements concerning public officials are protected by the First Amendment unless they were made with actual malice. *New York Times v. Sullivan*, 376 U.S. 254, 270, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964). The City cited an inapplicable case concerning commercial speech to support its argument. (MSJ Memo. p. 9). The City makes no argument that Kirkland acted with actual malice, nor does it have standing to do so.

**TOTALITY IS OVERSHADOWED BY EVIDENCE OF RETALIATION/CAUSATION**: As an initial matter, "totality" is not an element of a First Amendment retaliation claim, but Kirkland will interpret this to argue the third element, causation. The City referred to Kirkland's "attitude and ability to get along with others" and "**derogatory remarks she made on her Facebook account**" in the memorandum recommending her termination. (Crisp Dep. Ex. 33, p. 2). *See Yazdian,* 793 F.3d at 647, (a supervisor that referenced plaintiff's protected statements as examples of insubordination and "unwillingness to accept and apply constructive coaching" documents were considered direct evidence from which a reasonable jury could conclude that the employer believed the plaintiff's protected activity constituted insubordination, and therefore that the employee was terminated because of his protected statements). The City admits her First Amendment activity was a reason for her termination, this is enough to establish causation. Nonetheless, the City justifies its "totality" argument by referencing other complaints, that, since they were not cited to, one can only assume, is the Gribble complaint (Ex. 9) and her earlier Facebook post about Berrong's WVLT interview being embarrassing (Ex. 9-1). First, the Gribble gripe was "not sustained" by Graves. (Graves Dep. Ex. 9). Second, as set forth in the analysis above, Berrong is an elected official, who is not Kirkland's employer or in her chain of command, and Kirkland has every right to express her opinion about

an elected official on her personal facebook page. *Sowards v. Loudon County, Tennessee*, 203 F.3d 426, 432 (6th Cir. 2000) (political association is protected by the First Amendment). An anonymous "citizen complaint" by someone allegedly saying "take a look at this" is hearsay as is unsubstantiated speculation that Kirkland's ability to perform her job will be hampered by her political opinion. (Graves Dep. 10-11, Ex. 9-1). *Gillis v. Miller*, 845 F.3d 677, 687 (6th Cir. 2017) (speculative concerns or conclusory assessments are insufficient to outweigh a plaintiff's First Amendment rights). The City's "totality" argument is just a re-hash of the myriad of ways it feels justified in curtailing Kirkland's First Amendment rights and as well as blatant examples of evidence of retaliation on the basis of sex. For these reasons, and because of the City's plain admissions, a jury could conclude Kirkland's First Amendment rights were violated, thus, the motion must be denied.

In conclusion, these facts demonstrate that the reasons given by the City to discipline Kirkland are pretext. Drawing all reasonable inferences in Kirkland's favor, a reasonable jury could conclude that "the sheer weight of the circumstantial evidence of discrimination makes it 'more likely than not' that the employer's explanation is a pretext, or coverup," and that the City illegally retaliated and discriminated against Kirkland in violation of her First Amendment rights, Title VII and the THRA.

Respectfully submitted,

*/s Heather Moore Collins*
Heather Moore Collins BPR # 026099
Anne Hunter BPR # 022407
Collins & Hunter PLLC
7000 Executive Center Dr., Suite 320
Brentwood, TN 37027
615-724-1996
615-691-7019 FAX
heather@collinshunter.com
anne@collinshunter.com
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY certify that a copy of the foregoing has been served this 4th day of January 2021 through the court's CM/ECF system to: Reid Spaulding, Courtney Read, Watson, Roach, Batson & Lauderback PLC, P.O. Box 131, Knoxville, TN 37901-0131.

*s/ Heather Moore Collins*