**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TENNESSEE**
**AT KNOXVILLE**

| | | |
|---|---|---|
| SHAINA KIRKLAND, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:19-cv-00312-DCLC-HBG |
| | ) | JURY DEMAND |
| THE CITY OF MARYVILLE, | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFF'S RESPONSES TO DEFENDANT'S STATEMENT OF FACTS AND PLAINTIFF'S ADDITIONAL STATEMENT OF MATERIAL FACTS

Comes Now Plaintiff and Responds to Defendant's Statement of Facts:

1.      In August 2012, Plaintiff Shaina Kirkland was hired by the City of Maryville, Tennessee as a full-time reserve police officer. (Shaina Kirkland Dep., p. 21).

**RESPONSE: Undisputed.**

2.      During her time of employment with the City of Maryville, Tennessee police department as a full-time reserve police officer, on December 18, 2012, Ms. Kirkland was involved in a motor vehicle incident, striking a stationary traffic pylon causing damage to a city police cruiser while she was on duty. (Shaina Kirkland Dep., p 61, 62, Dep. Exh. 1).

**RESPONSE: Undisputed. However, the Defendant characterized this damage at the time as "minor," including the driver's side marker light broken and "scuff marks on [the] front bumper." (Kirkland Dep. Ex. 1).**

3.      Ms. Kirkland was elevated to the position of full-time police officer with the City of Maryville, Tennessee in March, 2013. She was assigned to the designation of patrolman. (Shaina Kirkland Dep., p 21).

**RESPONSE: Undisputed.**

4.      As set forth in the description for a City of Maryville, Tennessee police officer, police officers are to have the "ability to deal professionally, courteously and fairly with the public" and "establish and maintain effective relationship with associates and the general public." (Tony Crisp Dep. Exh. 55).

> **RESPONSE: Undisputed. However, the City Rules provide an employee may participate in political activities and support or oppose political candidates. (Crisp Dep. 50-51, Ex. 56 p. 001017; Best Dep. 15). General Order 2-10 provides guidelines for the use of social media by MPD members, including personal use of social media. (Crisp Dep. Ex. 49 p. 000477). Specifically, MPD members "are free to express themselves as private citizens while using social media" as long as such expression does not negatively affect the public's perception of MPD and are further cautioned on how their speech and social media activity may reflect upon MPD. (Crisp Dep. Ex. 49 p. 000477).**

5.      Later that same year, on October 17, 2013, Ms. Kirkland was the subject of an Employee Incident Report for swearing out a warrant regarding an alleged aggravated assault arrest only on the word of complaint. Kirkland received verbal counseling and remedial training as to evidence documentation, witness statements, and case preparation. (Shaina Kirkland Dep., p 67, Dep. Exh. 4.)

> **RESPONSE: Undisputed. However, Plaintiff, as a new officer was following the advice and counsel of more seasoned officers. (Kirkland Dep. 67). In her 2014 evaluation, Kirkland was rated 3-5 ("good" to "excellent") in all categories evaluated with an overall score in the "very good" range after her first year of being a full-time officer. (Crisp Dep. 57, Ex. 58 pp. 1-5). She was regarded as a hard worker, who would "readily volunteer for assignments and regularly turns out more than the normal**

**workload expected of her" (Crisp Dep. Ex. 58 p. 1); and "she is a team player, works well with other officers and continues to be a very good employee with the department. She has also tried to improve herself on a daily basis to become a better officer. She is still in the 'learning' curve of police work, but has done well in taking advice, etc. from senior officers and supervisors." (Crisp Dep. Ex. 58 p. 5).**

6.      On September 12, 2014, Ms. Kirkland was the subject of an Employee Incident Report, involving multiple complaints received by the City of Maryville, Tennessee from citizens as to the way Kirkland conducted herself during traffic stops. The citizen complaints involved allegations that Kirkland was rude to citizens during the traffic stops. Kirkland was verbally counseled as to how she presented herself at a stop or any type of interaction with the public. (Shaina Kirkland Dep., p. 70-72, Dep. Exh. 5).

**RESPONSE: Disputed that this is a Material Fact to the controversy. Nonetheless, undisputed.**

7.      On October 12, 2015, Kirkland was the subject of yet another Employee Incident Report, involving a complaint received by the City of Maryville, Tennessee from a citizen stating that Kirkland was "rude and unprofessional." Kirkland received verbal counseling that rudeness and shouting at a citizen is not acceptable behavior from a City of Maryville, Tennessee police officer. (Shaina Kirkland Dep., p. 78-81, Dep. Exh. 6).

**RESPONSE: Disputed that this is a Material Fact to the controversy. Nonetheless, undisputed. However, Kirkland's 2015 Evaluation contained 4's and 5's in all but one category, with her overall performance marked as "very good". (MSJ Ex. 1, March 28, 2015 Employee Performance/Achievement Expectations). Kirkland was praised for being the "most active officer on day shift" and "approach[ing] her daily routine in a professional manner…[with] a 'can do' attitude." (Id.). Kirkland**

**adapted well to changes in the department and "never questions the decision making process of said changes." (Id.). She served on a committee of officers within the department to identify and address issues and challenges within the department. (Id.). Kirkland received a 5, the top rating, in the teamwork category, with comments that she was very popular amongst her colleagues adapting well to day shift and its members, which her supervisor found "impressive" given that day shift was mostly senior officers within the department. (Id.). The evaluating supervisor stated: "Now, after completing her second year of service and gaining a considerable amount of knowledge and comfort in her job duties, this supervisor would like to see Shaina branch out within the department and assume roles on specialized teams and request more specialized training opportunities to further advance her career." (MSJ Ex. 1).**

8.     During her employment with the City, Shaina Kirkland signed up to be considered for a special assignment in the traffic unit in 2015, 2016, and the summer of 2017. (Declaration of Tony Crisp, ¶ 5).

**RESPONSE: Disputed. Plaintiff applied to be assigned to the traffic unit at least five separate times. (Kirkland Dep. 126).**

9.     Being specially assigned to the traffic unit does not result in an increase in pay. (Declaration of Tony Crisp, ¶ 7).

**RESPONSE: Undisputed.**

10.     At the times that Kirkland applied to be a member of the traffic unit, the minimum qualifications to be in the traffic unit are to be in good standing with the department, possess adequate job ability and investigatory skills, adequate knowledge of laws, rules of evidence, departmental rules, policies and procedures, adequate self-expression, and to be in possession of a

or able to attain a Tennessee Motorcycle Endorsement and successfully complete a police motorcyclist training program. (Declaration of Tony Crisp, ¶ 10).

**RESPONSE: Disputed. Objection as to authenticity and hearsay. Chief Crisp's declaration does not refer to any City policy and is not the proper source for this information. Defendant has presented no evidence of any policy regarding exceptions other than the self-serving affidavit of Chief Crisp himself. "Without more, self-serving affidavits are insufficient to sustain a motion for summary judgment." *Jadco Enterprises, Inc, v. Fannon*, 991 F. Supp. 2d 947, 955 (E.D. Ky. 2014). Self-serving affidavits without factual support in the record are insufficient to sustain a motion for summary judgment. *LNV Corp v. Gebhardt*, 2014 U.S. Dist. LEXIS 34749, at \*11 (E.D. Tenn. Mar. 18, 2014) (Defendant presents no evidence substantiating the claim other than its own affidavits). Affidavits cannot be used to resolve disputed factual issues nor to attack the credibility of the opposing party's witnesses. *Burley v. Quiroga*, 2019 U.S. Dist. LEXIS 125130 at \*20-21 (E.D. Mich. June 6, 2019) (citing *10 B Wright & Miller*, Fed. Prac. & Proc. Civ. Section 2738 (4th ed.)). As credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions. Id. (citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 254 (1986).**

11.     While Chief Tony Crisp, as head of the police department, can make exceptions to the minimum qualifications of possessing a Tennessee Motorcycle Endorsement and successfully completing basic police motorcycle school for officers who wish to be in the traffic unit, he has made such exceptions in the case of female officer Lesleyanne Weiss and Sgt. John Bivens, who possessed specialized skills to serve in the unit. (Declaration of Tony Crisp, ¶¶ 14-15).

**RESPONSE: Disputed. Objection as to authenticity and hearsay. Chief Crisp changed the minimum requirements the first year Lesleyanne Weiss applied for the traffic unit.**

The next year he removed the additional requirement for all applicants and Ms. Weiss was selected. (Weiss Decl. ¶¶ 27-29). Defendant has presented no evidence of any policy regarding exceptions other than the self-serving affidavit of Chief Crisp himself. "Without more, self-serving affidavits are insufficient to sustain a motion for summary judgment." *Jadco Enterprises, Inc, v. Fannon*, 991 F. Supp. 2d 947, 955 (E.D. Ky. 2014). Self-serving affidavits without factual support in the record are insufficient to sustain a motion for summary judgment. *LNV Corp v. Gebhardt*, 2014 U.S. Dist. LEXIS 34749, at *11 (E.D. Tenn. Mar. 18, 2014) (Defendant presents no evidence substantiating the claim other than its own affidavits). Affidavits cannot be used to resolve disputed factual issues nor to attack the credibility of the opposing party's witnesses. *Burley v. Quiroga*, 2019 U.S. Dist. LEXIS 125130 at *20-21 (E.D. Mich. June 6, 2019) (citing *10 B Wright & Miller*, Fed. Prac. & Proc. Civ. Section 2738 (4th ed.)). As credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions. Id. (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986).

12.     Lesleyanne Weiss had advanced accident investigation certification. Sgt. John Bivens has superior analytical skills in traffic investigation, is in charge of the department's grants from the Governor's Highway and Safety office and has extensive knowledge in the use of TITANs, which is used by officers in submitting traffic accident reports. (Declaration of Tony Crisp, ¶ 15).

**RESPONSE: Disputed. Objection as to authenticity and hearsay. Defendant has presented no evidence of the stated factual contention other than the self-serving affidavit of Chief Crisp himself. "Without more, self-serving affidavits are insufficient to sustain a motion for summary judgment." *Jadco Enterprises, Inc, v. Fannon*, 991 F. Supp. 2d 947, 955 (E.D. Ky. 2014). Self-serving affidavits without factual support**

**in the record are insufficient to sustain a motion for summary judgment.** *LNV Corp v. Gebhardt*, **2014 U.S. Dist. LEXIS 34749, at \*11 (E.D. Tenn. Mar. 18, 2014) (Defendant presents no evidence substantiating the claim other than its own affidavits). Affidavits cannot be used to resolve disputed factual issues nor to attack the credibility of the opposing party's witnesses.** *Burley v. Quiroga*, **2019 U.S. Dist. LEXIS 125130 at \*20-21 (E.D. Mich. June 6, 2019) (citing** *10 B Wright & Miller*, **Fed. Prac. & Proc. Civ. Section 2738 (4th ed.)). As credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions. Id. (citing** *Anderson v. Liberty Lobby, Inc.*, **477 U.S. 242, 254 (1986).**

13.    Lesleyanne Weiss became a full time police officer with the City of Maryville on July 19, 2008. (Lesleyanne Weiss Dep. pp. 22-23).

**RESPONSE: Undisputed.**

14.    Officer Weiss worked as a patrol officer after becoming a full-time police officer with the City of Maryville and was later assigned to the traffic unit in 2011. (Lesleyanne Weiss Dep. pp. 33-34).

**RESPONSE: Undisputed.**

15.    At the time she was assigned to the traffic unit in 2011, Officer Weiss had advanced crash investigation certification. (Lesleyanne Weiss Dep. p. 34).

**RESPONSE: Undisputed.**

16.    At the time of her last evaluation before she retired in 2014, Officer Weiss was recognized as "the matriarch" of the traffic unit, "utilizing her influence for the betterment of the division and building a more cohesive unit." (Lesleyanne Weiss Dep. p. 38-39, 46, Weiss Dep. Exh. 13).

**RESPONSE: Undisputed.**

17.     Chief Crisp interviews the officers that have signed up to be considered for a particular special assignment. Typically, a supervisor of the unit to which the officer wants to be assigned or other supervisors in the police department also participate in the interviews. (Declaration of Tony Crisp, ¶ 11).

> **RESPONSE: Disputed. Objection as to authenticity and hearsay. Chief Crisp's declaration does not refer to any City policy and is not the proper source for this information. Defendant has presented no evidence of any policy regarding exceptions other than the self-serving affidavit of Chief Crisp himself. "Without more, self-serving affidavits are insufficient to sustain a motion for summary judgment." *Jadco Enterprises, Inc, v. Fannon*, 991 F. Supp. 2d 947, 955 (E.D. Ky. 2014). Self-serving affidavits without factual support in the record are insufficient to sustain a motion for summary judgment. *LNV Corp v. Gebhardt*, 2014 U.S. Dist. LEXIS 34749, at \*11 (E.D. Tenn. Mar. 18, 2014) (Defendant presents no evidence substantiating the claim other than its own affidavits). Affidavits cannot be used to resolve disputed factual issues nor to attack the credibility of the opposing party's witnesses. *Burley v. Quiroga*, 2019 U.S. Dist. LEXIS 125130 at \*20-21 (E.D. Mich. June 6, 2019) (citing *10 B Wright & Miller*, Fed. Prac. & Proc. Civ. Section 2738 (4th ed.)). As credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions. Id. (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986).**

18.     In addition to the minimum qualifications of a particular special assignment, Chief Crisp determines whether that particular employee has the ability to meet the demands of that assignment based on the interview and that employee's performance up to that point with the City of Maryville police department. Officers that receive special assignments are evaluated on an

annual basis as to whether they will stay in that assignment. (Declaration of Tony Crisp, ¶ 12).

**RESPONSE: Disputed. Objection as to authenticity and hearsay. Defendant has presented no evidence of the stated factual contention other than the self-serving affidavit of Chief Crisp himself. "Without more, self-serving affidavits are insufficient to sustain a motion for summary judgment."** *Jadco Enterprises, Inc, v. Fannon*, **991 F. Supp. 2d 947, 955 (E.D. Ky. 2014). Self-serving affidavits without factual support in the record are insufficient to sustain a motion for summary judgment.** *LNV Corp v. Gebhardt*, **2014 U.S. Dist. LEXIS 34749, at \*11 (E.D. Tenn. Mar. 18, 2014) (Defendant presents no evidence substantiating the claim other than its own affidavits). Affidavits cannot be used to resolve disputed factual issues nor to attack the credibility of the opposing party's witnesses.** *Burley v. Quiroga*, **2019 U.S. Dist. LEXIS 125130 at \*20-21 (E.D. Mich. June 6, 2019) (citing** *10 B Wright & Miller*, **Fed. Prac. & Proc. Civ. Section 2738 (4th ed.)). As credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions. Id. (citing** *Anderson v. Liberty Lobby, Inc.*, **477 U.S. 242, 254 (1986).**

19.     Specifically, for the traffic unit assignment, during the interview, the officer is to provide to the Chief and the patrol division captain or traffic squad lieutenant his or her experience and reasons for applying for the position. Chief Crisp also examines whether the officer is in good physical condition in order to handle that particular assignment. (Declaration of Tony Crisp, ¶ 13).

**RESPONSE: Disputed. Objection as to authenticity and hearsay. Defendant has presented no evidence of the stated factual contention other than the self-serving affidavit of Chief Crisp himself.  "Without more, self-serving affidavits are insufficient to sustain a motion for summary judgment."** *Jadco Enterprises, Inc, v. Fannon*, **991 F. Supp. 2d 947, 955 (E.D. Ky. 2014). Self-serving affidavits without**

**factual support in the record are insufficient to sustain a motion for summary judgment.** *LNV Corp v. Gebhardt*, **2014 U.S. Dist. LEXIS 34749, at \*11 (E.D. Tenn. Mar. 18, 2014) (Defendant presents no evidence substantiating the claim other than its own affidavits). Affidavits cannot be used to resolve disputed factual issues nor to attack the credibility of the opposing party's witnesses.** *Burley v. Quiroga*, **2019 U.S. Dist. LEXIS 125130 at \*20-21 (E.D. Mich. June 6, 2019) (citing** *10 B Wright & Miller*, **Fed. Prac. & Proc. Civ. Section 2738 (4th ed.)). As credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions. Id. (citing** *Anderson v. Liberty Lobby, Inc.*, **477 U.S. 242, 254 (1986).**

20.     When Kirkland applied for the traffic unit in 2015 and 2016, Kirkland did not have her Tennessee motorcycle endorsement. However, once she finally obtained it, it took Kirkland three times to pass the civilian test to operate a motorcycle. (Declaration of Tony Crisp, ¶ 16; Kirkland Dep. p. 125).

> **RESPONSE: Disputed. Objection as to authenticity and hearsay. Chief Crisp stated in his self-serving affidavit that he "learned" it took Plaintiff three times to pass the test; he has no personal knowledge of the factual contention. (Declaration of Tony Crisp ¶ 16). Ms. Kirkland did not possess a Tennessee Motorcycle endorsement at the time of her initial applications because it was not required. (Kirkland Dep. 124).**

21.     Kirkland never asked to be sent to motorcycle school for law enforcement officers. (Kirkland Dep., p. 125).

> **RESPONSE: Undisputed. The minimum requirements for the traffic unit were only a willingness to obtain a motorcycle license, Plaintiff was not required at the time to be in possession of a license. (Kirkland Dep. 124).**

22.     Kirkland did not otherwise possess any specialized skills needed for the traffic unit

while employed with the City. (Declaration of Tony Crisp, ¶ 16).

> **RESPONSE: Disputed. Plaintiff was an experienced law enforcement officer who received high praises in 2014-2017, receiving marks from good to excellent on her evaluations. (Crisp Dep. Ex. 58 pp. 1-5; MSJ Ex. 1; MSJ Ex. 2). Her 2015 Evaluation contained 4's and 5's in all but one category, with her overall performance marked as "very good". (MSJ Ex. 1, March 28, 2015 Employee Performance/Achievement Expectations). Her supervisor praised her for being the "most active officer on day shift" and "approach[ing] her daily routine in a professional manner…[with] a 'can do' attitude." Id. It was also documented that Ms. Kirkland adapted well to changes in the department and "never questions the decision making process of said changes." Id. She served on a committee of officers within the department to identify and address issues and challenges within the department. Id. Ms. Kirkland received a 5, the top rating, in the teamwork category, with comments that she was very popular amongst her colleagues adapting well to day shift and its members, which her supervisor found "impressive" given that day shift was mostly senior officers within the department. Id. The evaluating supervisor stated: "Now, after completing her second year of service and gaining a considerable amount of knowledge and comfort in her job duties, this supervisor would like to see Shaina branch out within the department and assume roles on specialized teams and request more specialized training opportunities to further advance her career." (MSJ Ex. 1, March 28, 2015 Employee Performance/Achievement Expectations).**

> **Again, in her 2016 evaluation, she scored 3-5 in every category, with an overall score of very good. (MSJ Ex. 2, March 27, 2016 Employee Performance/Achievement Expectations). Her supervisor commented that she was a "solid officer" on the shift**

**and, praised her written reports, commenting "It is a very rare occasion when I have to request a revision to a report written by Officer Kirkland. She gathers the information required at the scene and writes a very good detailed narrative." (MSJ Ex. 2, March 27, 2016 Employee Performance/Achievement Expectations). It was also noted she "generally gets along with other officers and citizens alike." (MSJ Ex. 2, March 27, 2016 Employee Performance/Achievement Expectations).**

23.    Officer Madison Wethington is a female police officer with the City of Maryville. She was hired as a reserve officer on January 22, 2019. She became a full-time officer in approximately July of 2019. (Declaration of Tony Crisp, ¶ 26);

**RESPONSE: Disputed. Objection as to authenticity and hearsay. Disputed that this is a Material Fact to the controversy. Further, there are no facts in the record to support this factual allegation. Defendant has presented no evidence of the stated factual contention other than the self-serving affidavit of Chief Crisp himself. "Without more, self-serving affidavits are insufficient to sustain a motion for summary judgment." *Jadco Enterprises, Inc, v. Fannon*, 991 F. Supp. 2d 947, 955 (E.D. Ky. 2014). Self-serving affidavits without factual support in the record are insufficient to sustain a motion for summary judgment. *LNV Corp v. Gebhardt*, 2014 U.S. Dist. LEXIS 34749, at \*11 (E.D. Tenn. Mar. 18, 2014) (Defendant presents no evidence substantiating the claim other than its own affidavits). Affidavits cannot be used to resolve disputed factual issues nor to attack the credibility of the opposing party's witnesses. *Burley v. Quiroga*, 2019 U.S. Dist. LEXIS 125130 at \*20-21 (E.D. Mich. June 6, 2019) (citing *10 B Wright & Miller*, Fed. Prac. & Proc. Civ. Section 2738 (4th ed.)). As credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions. Id. (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986).**

24.     Officer Wethington was chosen to be on the traffic unit on September 12, 2020 subject to successful completion of the police motorcyclist training program. She completed that program on October 2, 2020. (Declaration of Tony Crisp, ¶ 27).

**RESPONSE: Undisputed. Defendant hired a female and promoted her to the traffic unit within just over a year of her employment, after Plaintiff filed her lawsuit. (Complaint, ECF 1).**

25.     Sharon Moore was hired as full-time police officer at the City of Maryville on April 14, 1990. Captain Moore was promoted to sergeant in the Criminal Investigations division of the department in June 2000. (Declaration of Tony Crisp, ¶ 28).

**RESPONSE: Undisputed.**

26.     Moore was promoted to lieutenant in 2005 and assigned to the Office of Professional Standards, Training and Planning. In 2007, Moore was promoted to captain. (Declaration of Tony Crisp, ¶ 29).

**RESPONSE: Undisputed.**

27.     Captain Sharon Moore, at all times relevant, was responsible for the administration of the Field Training Officer program at the City of Maryville, Tennessee police department. (Declaration of Tony Crisp, ¶ 30).

**RESPONSE: Undisputed.**

28.     Kirkland was made a Field Training Officer by the City of Maryville, Tennessee Police Department on May 3, 2016. (Declaration of Tony Crisp, ¶ 31).

**RESPONSE: Undisputed.**

29.      Field Training Officers with the City of Maryville, Tennessee do not receive additional pay over and above their normal rank compensation. (Shaina Kirkland Dep., p. 87).

**RESPONSE: Undisputed.**

30. Field Training Officers have the responsibilities of training assigned introductory officers in the field i.e. on the job and completing Daily Observance Report for the field training officer's assigned introductory officers. Field training officers also attend bi-weekly evaluation meetings with the training officer during the field training period to discuss the progress of that field training officer's assigned introductory officers. (Declaration of Tony Crisp, ¶ 32).

**RESPONSE: Undisputed.**

31. While working as a field training officer, Kirkland was still performing her duties as a police officer assigned to the patrol division. (Declaration of Tony Crisp, ¶ 33).

**RESPONSE: Undisputed.**

32. On October 10, 2017, Kirkland was the subject of another Employee Incident Report regarding the departmental violation of "unbecoming conduct." (Shaina Kirkland Dep., p. 81-87, Dep. Exh. 7).

**RESPONSE: Disputed. Plaintiff was reprimanded for "speaking negatively" about Defendant. (Moore Dep. Ex. 8). Captain Sharon Moore issued a Written Reprimand to Kirkland disciplining her for raising concerns that she was discriminated against based on her gender and the off-hand boot comment. (Moore Dep. 17-22, Ex. 8; Kirkland Dep. 86-87).**

33. Regarding the October 10, 2017 Employee Incident Report, Kirkland, in her role as a Field Training Officer, on or about September 27, 2017, took Officer Nix to the Blount County animal shelter. While there, Kirkland began complaining about required police department shoes, stating that the requirements were "stupid." During this same incident, Kirkland stated that new officers riding with patrol officers a few weeks before the academy starts "was stupid" because those new officers have to be re-taught after graduating from academy. These comments were made in front of new police recruits. (Shaina Kirkland Dep., pp. 81-87, Dep. Exh. 7).

**RESPONSE: Disputed.** In September 2017, Kirkland was acting as a Field Training Officer for a female trainee. (Kirkland Dep. 81-87). In discussing her experience at the department, Kirkland stated she had applied for the Traffic Unit and other special assignments and had been passed over for male officers and made an off-hand comment about uniform boots. (Kirkland Dep. 81-87, Ex. 7 p. 3). Subsequently, on October 10, 2017, Captain Sharon Moore issued a Written Reprimand to Kirkland disciplining her for raising concerns that she was discriminated against based on her gender and the off-hand boot comment. (Moore Dep. 17-22, Ex. 8; Kirkland Dep. 86-87). Specifically, Kirkland was reprimanded for stating MPD "isn't a good department to work for if you are female," and her concern that she had been passed up for special assignments in the past due to her gender; her concerns were characterized as negativity toward the department that would not be tolerated, and she was indefinitely suspended from her duties as a Field Training Officer. (Moore Dep. 21, Ex. 8). Kirkland was warned she was to immediately refrain from speaking negatively about the department and decisions made by the Chief. (Moore Dep. Ex. 8). Chief Crisp confirmed he was first made aware that Kirkland made complaints that MPD was not good to work for as a female and perceived she was passed over for special assignments because she was female in 2017. (Crisp Dep. 101-102). Even though the MPD was aware of Kirkland's discrimination concerns, Kirkland was not referred to Human Resources for investigation or counseling due to the discrimination concerns she raised. (Moore Dep. 21). No investigation into her allegation of sexual discrimination was ever undertaken. (Moore Dep. 18-21).

34.     Captain Sharon Moore, at all times relevant, was responsible for the administration of the Field Training Officer program at the City of Maryville, Tennessee police department.

(Sharon Moore Dep., p. 13; Declaration of Tony Crisp, ¶ 30).

**RESPONSE: Undisputed.**

35. On October 11, 2017, Kirkland received a written reprimand from Cpt. Sharon Moore regarding the September 27, 2017 incident at the Blount County animal shelter. Kirkland was also suspended by Captain Sharon Moore indefinitely from her duties as a field training officer as a result of those incidents. (Shaina Kirkland Dep., p. 88, Dep. Exh. 8).

**RESPONSE: Undisputed that Ms. Kirkland received a written reprimand on October 11, 2017. The rest of the statement is disputed as written. Captain Moore testified that she suspended Ms. Kirkland indefinitely from working as FTO officer because she received information that Ms. Kirkland told Officer Barry that "this isn't a good department to work for if you're female and that [she] had been passed up for special assignments in the past." (Moore Dep. 18 – 21.) The reason she was suspended was due to her complaints that the department wasn't good to work for if she was female because "that kind of negativity will not be tolerated." (Moore Dep. 21.) Captain Moore did not investigate Ms. Kirkland's complaints of discrimination, did not pass on the complaints to Human Resources, nor did she ask Officer Kirkland about those allegations. (Moore Dep. 18, 21). Captain Moore did not talk with Ms. Kirkland before making the decision to issue the reprimand and suspension. (Moore Dep. 23).**

36. Kirkland lost no pay as a result of her the written reprimand and suspension from the field training officer position issued by Captain Sharon Moore. (Shaina Kirkland Dep,. p. 87)

**RESPONSE: Undisputed. However, Kirkland was removed indefinitely from her FTO duties in large part due to expressing her concerns about gender discrimination at the MPD and MPD brought up this reprimand again when she**

**was reprimanded in 2018, thus, clearly that complaint continued to be an issue for MPD management. (Moore Dep. 36, Ex. 13; Kirkland Dep. Ex. 7, 8).**

37.     On February 12, 2018, Kirkland was the subject of another Employee Incident Report. The City of Maryville received a complaint from a citizen, Holli Gribble, alleging that Kirkland was rude to her. Kirkland met with City of Maryville, Tennessee patrol Captain David Graves regarding the complaint and Graves advised Kirkland regarding her encounters with the public. (Shaina Kirkland Dep., p. 89-90, Dep. Exh. 9).

> **RESPONSE: Undisputed. However, Plaintiff maintains she was never disrespectful and instead she explained to the civilian a police report was unnecessary as an individual had unsuccessfully attempted to use Ms. Gribble's credit card online. (Kirkland Dep. Ex. 9). Per Ms. Gribble's written complaint, she stated, "As a disclaimer, I am putting verbiage based on the best of my recollection as I didn't write this down word for word." Id. As there was no crime, Plaintiff advised Ms. Gribble of her next steps. (Kirkland Dep. 89-90, Ex. 9). Further, the reprimand itself notes Plaintiff's innocence or guilt in the accusation is difficult to determine. (Kirkland Dep. Ex. 9)**

38.     Also, on February 12, 2018, Kirkland was the subject of an additional Employee Incident Report. This Employee Incident Report of that date related to a complaint made by a citizen regarding a post made by Officer Kirkland on Facebook. The Facebook post related to Blount County Sheriff James Berrong. Graves verbally counselled Kirkland regarding the citizen complaint. Graves emphasized that Kirkland was, of course, free to express her opinion online about political candidates. Graves also verbally counselled Kirkland against taking actions that could impair the City police department's working relationships with other agencies that provide services to the public. (Shaina Kirkland Dep., pp. 92, 97, Dep. Exh. 9-1; David Graves Dep. pp.

11, 15).

> **RESPONSE: Disputed. Captain David Graves reprimanded Kirkland for her personal social media post because it was "negative" rather than supportive. (Kirkland Dep. 91-92, Ex. 9). Kirkland was the only MPD employee who openly did not support Sheriff Berrong's re-election. (Crisp Dep. 41). Under the City's policies, Kirkland and employees could publicly oppose the re-election of Sheriff Berrong. (Crisp Dep. 51, Ex. 56 p. 53). Although Chief Crisp testified that MPD does not do anything specific to monitor its officers' social media use, he also admitted that Ms. Kirkland exclusively was disciplined for her social media use in the last five years. (Crisp Dep. 24).**

39.  Kirkland received no discipline, suspension from work, loss of pay or benefits as a result of Captain Graves' two verbal counsellings of her on February 12, 2018. (Shaina Kirkland Dep., p. 99)

> **RESPONSE: Disputed. A verbal counseling is a disciplinary action used and a supervisor may use a written warning "where an oral warning has not resulted in the expected improvement." (Crisp Dep. Ex. 52 p. 000492).**

40.  Around the same time period as the February 12, 2018 Employee Incident Report stated above, Kirkland made another post on Facebook. Kirkland shared a picture of Sheriff Berrong on Facebook, referring to the Sherriff's supporters as "brainwashed minions." (Shaina Kirkland Dep., p. 97).

> **RESPONSE: Undisputed.**

41.  Kirkland received no discipline, suspension from work, loss of pay or benefits as a result of her Facebook post referring to the Sherriff's supporters as "brainwashed minions." (Shaina Kirkland Dep., p. 99)

**RESPONSE: Disputed. A verbal counseling is a disciplinary action used and a supervisor may use a written warning "where an oral warning has not resulted in the expected improvement. (Crisp Dep. Ex. 52 p. 000492).**

42.     In approximately 2007, Kirkland was employed by the Blount County Sheriff's Office as a member of the jail staff for a short period of time. (Shaina Kirkland Dep., p. 33-34).

**RESPONSE: Disputed that this is a Material Fact for the controversy at issue. Objection to relevance. Undisputed that Kirkland testified that she worked at the Blount County Sherriff's Office between 2007, 2008.**

43.     Kirkland was involved in an incident at the jail that resulted in her termination. (Shaina Kirkland Dep., p. 36-37).

**RESPONSE: Disputed that this is a Material Fact for the controversy at issue. Objection to relevance. Disputed that Kirkland testified that she was involved in an incident at the jail that resulted in her termination. Rather, Kirkland testified that she was asked to resign and did not "remember the parameters of why, though." (Kirkland Dep. 36).**

44.     Kirkland appealed to the Sheriff to void the firing, and he declined. (Shaina Kirkland Dep., p. 39).

**RESPONSE: Disputed that this is a Material Fact for the controversy at issue. Objection to relevance. Disputed that Kirkland's testimony is properly characterized in the factual contention. Kirkland testified that she called and set up a meeting with Sheriff Berrong to explain what had happened and to ask if there was anything he could do to get her job back. (Kirkland Dep. 38-39). Berrong told Plaintiff he would "look into it." (Kirkland Dep. 39). There is no testimony suggesting Plaintiff believed Sheriff Berrong declined to void the firing and nor any Blount County Protocols to**

**suggest it was in the Sheriff's practice to do so.**

45.     On March 28, 2018, Kirkland was involved in motor vehicle accident in a Maryville City police vehicle striking, a white Explorer in responding to assist another officer. Sgt. Porter spoke with Kirkland as to paying attention to her surroundings and judging distances when making maneuvers while responding to calls. (Shaina Kirkland Dep., p. 66, Dep. Exh. 3).

**RESPONSE: Undisputed.**

46.     The State of Tennessee requires that each police officer complete, at a minimum, 40 hours of in-service training each year to maintain that officer's certification by the Peace Officer Standards and Training Commission ("POST"). (Declaration of Tony Crisp, ¶ 34).

**RESPONSE: Disputed. Objection as to foundation and hearsay. Chief Crisp cannot testify as evidence the requirements of the State of Tennessee POST certification. Further, "Without more, self-serving affidavits are insufficient to sustain a motion for summary judgment."** *Jadco Enterprises, Inc, v. Fannon*, **991 F. Supp. 2d 947, 955 (E.D. Ky. 2014). Self-serving affidavits without factual support in the record are insufficient to sustain a motion for summary judgment.** *LNV Corp v. Gebhardt*, **2014 U.S. Dist. LEXIS 34749, at \*11 (E.D. Tenn. Mar. 18, 2014) (Defendant presents no evidence substantiating the claim other than its own affidavits). Affidavits cannot be used to resolve disputed factual issues nor to attack the credibility of the opposing party's witnesses.** *Burley v. Quiroga*, **2019 U.S. Dist. LEXIS 125130 at \*20-21 (E.D. Mich. June 6, 2019) (citing** *10 B Wright & Miller*, **Fed. Prac. & Proc. Civ. Section 2738 (4th ed.)). As credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions. Id. (citing** *Anderson v. Liberty Lobby, Inc*., **477 U.S. 242, 254 (1986).**

47.     City of Maryville, Tennessee police officers are paid by the City of Maryville,

Tennessee while they attend the required in-service training. (Declaration of Tony Crisp, ¶ 35).

**RESPONSE: Undisputed.**

48.     City of Maryville, Tennessee police officers are sent to the Blount County Sheriff's Department to complete each City of Maryville police officer's required in-service training. (Declaration of Tony Crisp, ¶ 36).

> **RESPONSE: Disputed. While Defendant employees receive in-service training at Blount County, they may obtain in-service training with other departments and do not have to receive their training form a particular site. (Moore Dep. 10-11; Kirkland Dep. 186). She further testified that there is no policy or regulation that requires officers to receive their 40 hours from the Blount County Sherriff's Office. (Moore Dep. 11).**

49.     No federal funds are expended by the City in regard to the Blount County Sheriff's Department's in-service training. (Declaration of Tony Crisp, ¶ 37).

> **RESPONSE: Disputed. Objection, foundation and hearsay. There is no foundation for the testimony in Crisp's declaration. Captain Moore testified that the City of Maryville is "compensated through the State" for the training. (Moore Dep. 10). There was no testimony or evidence regarding whether the State utilized federal funding to reimburse the Blount County Sheriff's Department nor the Maryville Police Department.**

50.     During an in-service training session regarding scenario-based training on May 29, 2018 at the Blount County Sheriff's Office for vehicle-based officer down rescues, Kirkland drove a rescue vehicle and began to drive forward toward a downed officer in the scenario, Blount County Sheriff's Deputy Pete Rivas. Blount County Sheriff's Deputy Drew Brakebill and other safety officers yelled at Kirkland to terminate the scenario to prevent Rivas from being run over

by Kirkland. (Shaina Kirkland Dep., p. 100 to 102, Dep. Exh. 10).

> **RESPONSE: Disputed. On May 29, 2018, while at the BCSO in-service, Kirkland was selected to participate in a training exercise involving a high stress situation requiring rescue of an officer down and ambush by gunfire. (Kirkland Depo. 100-101, Ex. 10; Crisp Dep. 67, Ex. 13). In the exercise, where all trainees were wearing simunition helmets, Kirkland was selected to be the driver of an SUV during the exercise and other officers were yelling at her to "go, go, go;" while the trainee playing the part of the downed suspect was lying in front of the SUV being driven by Kirkland. (Ex. 13). It was then reported this person lying in front of the SUV was almost run over. (Kirkland Dep. Ex. 13). Despite being yelled at to "go, go, go" Kirkland stopped the SUV when instructors commanded her to do so and no one was harmed. (Id; Crisp Dep. 67).**

51.    Had the training exercise of May 29, 2018 referenced above not been terminated abruptly in an emergency manner, Kirkland agrees that she could have run over Deputy Rivas, resulting in his death. (Shaina Kirkland Dep., p. 101-102).

> **RESPONSE: Disputed. Had the training exercise not been conducted as it had, no person would have been put in harm's way. Despite being yelled at to "go, go, go" Kirkland managed to stop the SUV when instructors commanded her to do to and no one was harmed. Id.**

52.    Kirkland attended additional in-service training at the Blount County Sheriff's Office on June 1, 2018. While at the in-service training session, Kirkland refused to shake the hand of BCSO investigator Paul Grady. Grady produced a memorandum of the event, addressed to Sheriff Berrong. (Shaina Kirkland Dep., p. 105, Dep. Exh. 11).

> **RESPONSE: Undisputed. However, Plaintiff, prior to the in-service, expressed her**

**concerns to Captain Graves about the treatment she might receive at in-service training. (Crisp Dep. Ex. 60 p. 000335). As she arrived for the training, four of the Blount County deputies wore shirts supporting Sheriff Berrong's political campaign. Id. Plaintiff immediately called Capt. Graves that the harassing treatment towards her began and she was afraid for her safety. Id. Capt. Graves called Plaintiff back advising that Chief Crisp has refused to pull her out of the class. Id. The next day, Plaintiff politely declined to shake the hand of the Blount County deputy who supported a Facebook page which included a link to a website that individuals had anonymously bullied and harassed Plaintiff. Id.**

53.     On June 4, 2018, Blount County Sheriff Berrong sent a letter to City of Maryville Police Chief Crisp, requesting that Maryville cease sending Officer Kirkland to the POST in-service training or any other training at BCSO. (Shaina Kirkland Dep., p. 106, Dep. Exh. 12).

**RESPONSE: Undisputed.**

54.     Other women law enforcement officers attended the Blount County Sheriff's Office in-service training. (Shaina Kirkland Dep. p. 159).

**RESPONSE: Undisputed. However, Kirkland was the only MPD employee who openly did not support Sheriff Berrong's re-election. (Crisp Dep. 41).**

55.     No other female officers have been banned from Blount County Sheriff's in-service training. (James Berrong Dep. p. 13).

**RESPONSE: Undisputed. However, Kirkland was the only MPD employee who openly did not support Sheriff Berrong's re-election. (Crisp Dep. 41).**

56.     Upon receiving the June 4, 2018 letter from Sheriff Berrong, City of Maryville Police Chief Tony Crisp directed City of Maryville Police Captain Sharon Moore to look into the incidents referenced in Berrong's letter. (Declaration of Tony Crip, ¶ 38; Sharon Moore Dep., p.

27; Dep. Exh. 12).

**RESPONSE: Disputed. The deposition testimony of Captain Moore cited in this statement does not support this factual allegation. Captain Moore does not testify that she was directed to look into the incidents in Berrong's letter. The deposition testimony cited only states: "like I backed up in the narrative at the top that said on June 4th, 2018, that I was contacted by Chief Crisp." There is no testimony that she was directed to "look into the incidents." Defendant has presented no evidence Chief Crisp directed Captain Moore to "look into the incident" other than the self-serving affidavit of Chief Crisp himself. "Without more, self-serving affidavits are insufficient to sustain a motion for summary judgment." *Jadco Enterprises, Inc, v. Fannon*, 991 F. Supp. 2d 947, 955 (E.D. Ky. 2014). Self-serving affidavits without factual support in the record are insufficient to sustain a motion for summary judgment. *LNV Corp v. Gebhardt*, 2014 U.S. Dist. LEXIS 34749, at \*11 (E.D. Tenn. Mar. 18, 2014) (Defendant presents no evidence substantiating the claim other than its own affidavits). Affidavits cannot be used to resolve disputed factual issues nor to attack the credibility of the opposing party's witnesses. *Burley v. Quiroga*, 2019 U.S. Dist. LEXIS 125130 at \*20-21 (E.D. Mich. June 6, 2019) (citing *10 B Wright & Miller*, Fed. Prac. & Proc. Civ. Section 2738 (4th ed.)). As credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions. Id. (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986).**

57.    After the City received Sheriff Berrong's letter, Kirkland and Captain Sharon Moore meet to discuss what happened at in-service training at BCSO and review video of training scenario. (Exhibit 1-Audio Recording).

**RESPONSE: Undisputed.**

24

58.      In a memo to Chief Tony Crisp dated June 8, 2018, Captain Sharon Moore recommended that Kirkland be suspended without pay due to her findings of her investigation regarding the incidents involving Kirkland at the Blount County Sheriff's Office on May 29, 2018 and June 1, 2018. (Sharon Moore Dep.,p. 29 , Dep. Exh. 13).

**RESPONSE: Disputed. The deposition testimony of Captain Moore cited in this statement does not support this factual allegation. Nowhere on p. 29 of her deposition does Captain Moore testify that she recommended that Kirkland be suspended without pay due to her findings of her investigation. Undisputed that Exhibit 13 is a Memo dated June 8, 2018, from Captain Moore to Chief Crisp recommending a written reprimand and 3-day suspension of Ms. Kirkland.**

59.      In addition to the June 8, 2018 memorandum, Captain Moore recommended to Chief Crisp that Kirkland be terminated due to her "childish" behavior. (Sharon Moore Dep., p. 32; Exh. 13).

**RESPONSE: Disputed. The deposition testimony of Captain Moore cited in this statement does not support this factual allegation. Captain Moore did not testify at her deposition that she recommended Kirkland be terminated due to her "childish behavior," rather, she testify that she recommended Kirkland be terminated "for the totality of the situation, yes. Not for a specific incident." (Moore Dep. 32). The "totality of the situation" included the incident at the animal shelter in 2017 where she also talked about her perception of the way female officers were treated. Id.**

60.      On June 11, 2018, Captain Sharon Moore documented her interaction with Kirkland regarding her investigation as to the incidents at the Blount County Sheriff's Office involving Kirkland with an Employee Incident Report. (Sharon Moore Dep., p. 26-27, Dep. Exh. 12).

**RESPONSE: Disputed. The deposition testimony of Captain Moore cited in this**

**statement does not support this factual allegation. Nothing in the cited deposition testimony reflects that Captain Moore "documented her interaction with Kirkland regarding her investigation."**

61.    Upon reviewing the recommendations of Captain Sharon Moore, Chief Crisp recommended a 3-day suspension, without pay, for Kirkland due to the totality of her actions in a memo dated June 26, 2018 to City of Maryville, Tennessee Assistant City Manager Roger Campbell citing Chapter XII, Section A of City's Personnel Rules and Procedures. (Tony Crisp Dep., p. 71-72; Declaration of Tony Crisp, ¶ 39; Dep. Exh. 14).

**RESPONSE: Disputed. On June 26, 2018, Chief Crisp sent his recommendation to suspend Kirkland without pay to Assistant City Manager Roger Campbell due to Kirkland's "attitude and ability to get along with others," her "blatant disrespect for [BCSO's] instructors and deputies" and handling herself in an unsafe manner in the training exercise. (Crisp Dep. 71, Ex. 14). Noticeably, rather than it just being a declination to shake one person's hand, she was accused of "disrespect" to multiple "instructors and deputies"- in the plural, despite no facts to support wide-spread disrespect. Id.**

62.    On July 9, 2018, City of Maryville, Tennessee Assistant City Manager Roger Campbell sends a memo to Kirkland as to pre-disciplinary hearing scheduled for July 10, 2018 based on Chief Crisp's recommendation of suspension, should she so choose. Kirkland did pursue review of Crisp's recommendation. (Shaina Kirkland Dep., p. 115-116, Dep. Exh. 15).

**RESPONSE: Undisputed.**

63.    On this same date, Chief Crisp, Sergeant Porter, and Shania Kirkland met to discuss Chief Crisp's recommendation to suspend Shania Kirkland. (Declaration of Tony Crisp, ¶ 40; 7/9/18 Audio Recording).

**RESPONSE: Undisputed.**

64.     In that meeting, Chief Crisp reiterated to Kirkland that she needed to work on her attitude and her relationships with officers with the City and other law enforcement officers in the community, including Blount County Sheriff's Department deputies. (Declaration of Tony Crisp, ¶ 41; Exhibit 2-7/9/18 Audio Recording 2:30-3:45; 14:16-14:30). Chief Crisp further reiterated that Kirkland could express her political opinion for any candidate running for office, but the police department has a policy that police officers cannot take actions that would harm their working relationships with other law enforcement agencies. (Declaration of Tony Crisp, ¶ 41; Exhibit 2-7/9/18 Audio Recording, 10:30-10:45; Dep. Exh. 54).

**RESPONSE: Disputed. During this meeting, Kirkland further informed Chief Crisp of the pattern harassment she experienced at during the in-service training. (7/9/18 Audio Recording, 0:00-1:10). Chief Crisp brushed her off stating that she is thinking about everything but the well-being of the department and her behavior needed to change and she needed to not "getting into to feuds with everybody." (7/9/18 Audio Recording 2:12-2:43). Kirkland reiterated the gender discrimination she experienced on the online websites anonymously commenting about her and her weight. (7/9/18 Audio Recording 2:53-3:08). Kirkland stated it seemed like expectation is that she just sit back and take it, to which Chief Crisp replied, "Two wrongs don't make a right." (7/9/18 Audio Recording 3:08). Chief Crisp further admits that Captain Graves counselled Kirkland about her Facebook comments regarding Sheriff Berrong. (7/9/18 Audio Recording 3:25-3:35). Crisp further states he is aware that other employees could "shoot her the bird" and that would not be against the law, but he will not allow her any extra duty jobs until she is good to do good work. (7/9/18 Audio Recording 5:26-5:39).**

**Disputed that Crisp stated "police officers cannot take actions that would harm their working relationships with other law enforcement agencies." Instead, he stated, employees could put signs on their yards, but that "there are policies that you can't talk about other law enforcement officers" and "just don't cross that line." (7/9/18 Audio Recording 7/9/18 10:29). Kirkland reiterated that she was being harassed online and that she had asked Capt. Graves if he knew about the website and he said he did. Crisp stated he is the keeper of this department and here to control his people. (7/9/18 Audio Recording 10:29-12:18).**

65.    Chief Crisp informed Kirkland that he wanted her to succeed in her employment with the City. (Declaration of Tony Crisp, ¶ 42; Exhibit 2-7/9/18 Audio Recording, 13:20-13:45). However, Kirkland was allowing her personal issues and personal disputes with Blount County Sheriff deputies interfere with her job duties as a police officer. (Declaration of Tony Crisp, ¶ 42; Exhibit 2-7/9/18 Audio Recording, 2:30-2:42; 5:16-5:50; 8:12-9:14; 18:50-19:12).

**RESPONSE: Disputed. While Crisp stated he wanted Kirkland to succeed this was contingent on her "change of attitude," which throughout the conversation included references to Ms. Kirkland speech and statements on Facebook regarding the election. (7/9/18 Audio Recording 13:44). However, Crisp seeks to remedy his statements through a self-serving affidavit. "Without more, self-serving affidavits are insufficient to sustain a motion for summary judgment."** *Jadco Enterprises, Inc, v. Fannon*, **991 F. Supp. 2d 947, 955 (E.D. Ky. 2014). Self-serving affidavits without factual support in the record are insufficient to sustain a motion for summary judgment.** *LNV Corp v. Gebhardt*, **2014 U.S. Dist. LEXIS 34749, at \*11 (E.D. Tenn. Mar. 18, 2014) (Defendant presents no evidence substantiating the claim other than its own affidavits). Affidavits cannot be used to resolve disputed factual issues nor to**

attack the credibility of the opposing party's witnesses. *Burley v. Quiroga*, 2019 U.S. Dist. LEXIS 125130 at *20-21 (E.D. Mich. June 6, 2019) (citing *10 B Wright & Miller*, Fed. Prac. & Proc. Civ. Section 2738 (4th ed.)). As credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions. Id. (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986).

In this conversation Kirkland repeatedly stated she was being harassed for her political statements and retaliated against. (7/9/18 Audio Recording 00:40, 9:45, 15:24). Chief Crisp admitted Blount County employees "probably were" wearing their Berrong t-shirts on purpose because Kirkland was there. (7/9/18 Audio Recording 16:17). When Kirkland again explained the harassment she was receiving online, Crisp just stated, "there is too much drama," and referred to her harassment as "this little thing you have going on with the County." (7/9/18 Audio Recording 17:08, 18:50).

During this meeting, Sgt. Porter suggested Kirkland distance herself from the "drama," delete her Facebook, and let things go and not "respond." (7/9/18 Audio Recording 19:16, 20:00). Sgt. Porter acknowledged the Blount County deputies wore the t-shirts to "get a rise out of her," but she needed to "swallow the pill" and not respond. (7/9/18 Audio Recording 22:16-23:50).

66.    In 2018, Crisp received a phone call from a citizen who was concerned about whether the City police department and Blount County Sheriff's Department could work together based on Kirkland's Facebook posts. (Declaration of Tony Crisp, ¶ 43; Exhibit 2-7/9/18 Audio Recording, 8:56-9:14).

**RESPONSE: Disputed. Objection as to foundation and hearsay. According to Chief Crisp a citizen called in saying they were concerned the officers would not back each**

**other up but was not made clear was who called to voice this concern and to whom the concern was regarding whether the officers would not back up Kirkland or vice versa. (7/9/18 Audio Recording 8:56-9:15).**

67. On July 10, 2018, Kirkland attended a hearing in front of Assistant City Manager Roger Campbell, also involving Chief Tony Crisp and then City of Maryville, Tennessee Human Resources Director Teresa Best. (Shaina Kirkland Dep., p. 117).

**RESPONSE: Undisputed.**

68. Assistant City Manager Roger Campbell sends memo to Kirkland on July 11, 2018 with his determination to uphold the recommendation of a 3 day without pay suspension following the hearing. In that memo, Kirkland is advised of her right of additional review by the City Manager. (Shaina Kirkland Dep., p. 117, Dep. Exh. 16).

**RESPONSE: Undisputed.**

69. Kirkland exercised her right to have the City of Maryville, Tennessee City Manager, Greg McClain, review the recommendation of a three day without pay suspension. (Shaina Kirkland Dep., p. 118).

**RESPONSE: Undisputed.**

70. On July 17, 2018, the review hearing as requested by Kirkland was held in front of City of Maryville, Tennessee City Manager Greg McClain. (Shaina Kirkland Dep.,p. 118).

**RESPONSE: Undisputed. While City Manager Greg McClain upheld the 3-day suspension for disrespect, he dismissed the allegation concerning the training exercise unconvinced that any other officer would have reacted differently. (McClain Dep. Ex. 17).**

71. In determining whether Kirkland should be disciplined for her actions at the Blount County Sheriff's Department in-service training, Greg McClain spoke with Detective Fernandez

as to what occurred at the in-service training. (Greg McClain Dep. p. 53).

**RESPONSE: Undisputed. McClain dismissed the allegation concerning the training exercise unconvinced that any other officer would have reacted differently. (McClain Dep. Ex. 17).**

72.     City Manager Greg McClain sends a memo to Kirkland dated July 18, 2018, upholding the recommendation of a 3 day suspension as to the disrespectful manner in which she conducted herself during Blount County Sheriff's Office in-service training. In the memo, McClain dismissed the matter as to Kirkland's actions during the training exercise at Blount County Sheriff's Office. (Shaina Kirkland Dep., p.118, 119, Dep. Exh. 17).

**RESPONSE: Undisputed.**

73.     On July 18, 2018, Chief Crisp sent a memo to HR Director Teresa Best, advising that Kirkland will serve her suspension July 23-26, 2018. (Shaina Kirkland Dep., p. 120, Dep. Exh. 18).

**RESPONSE: Undisputed.**

74.     Kirkland sends a memo to Greg McClain, copying the HR Director, Teresa Best on July 22, 2018. For the first time in written form, Kirkland in this memo alleges discrimination on the basis of her gender. (Shaina Kirkland Dep., p. 121, Dep. Exh. 19).

**RESPONSE. Undisputed that Kirkland sent the memo to Greg McClain on July 22, 2018. Disputed as to the remaining contentions. After repeated complaints to her superiors including Chief Crisp and Capt. Graves, Kirkland felt that MPD was going to continue its pattern of discrimination and retaliation, thus on July 22, 2018, Kirkland sent a memo to Greg McClain, City Manager, and Teresa Best advising City administration of her "Discrimination Claims." (Kirkland Dep. Ex. 19; Best Dep. 16 (can't recall receiving); McClain Dep. 22-23 (recalls giving to Best); Crawford Dep.**

**17 (saw when transitioning to Best's role). In her Memo, Kirkland expressed her belief that she had been discriminated against on the basis of her gender, setting forth in detail her multiple applications to the traffic unit, request for the rank of Corporal, application for the Fifth Judicial Drug Task Force, try out for the SWAT team, the 2017 reprimand where she spoke out about females being treated differently, inappropriate notes left in her mailbox, and the BCSO training week incidents, including that she had brought issues of retaliation to Captain Graves' attention to no avail. (Ex. 19). All of which led Kirkland to conclude she was being subjected to a hostile work environment and expressed her belief that she was being retaliated against for talking about discrimination. (Ex. 19).**

75.     Kirkland files her claim of discrimination with the Equal Employment Opportunity Commission (hereinafter "EEOC") on July 26, 2018. (EEOC Charge of Discrimination).

**RESPONSE: Undisputed.**

76.     On or about July 28, 2018, Kirkland posts a "meme"/picture on Facebook, with the caption: "Forgive me if I don't shake hands." (Shaina Kirkland Dep., p 134, Dep. Exh. 21).

**RESPONSE: Undisputed.**

77.     Teresa Best retired as the City of Maryville, Tennessee Human Resources Director in early August, 2018. (Teresa Best Dep., p. 7).

**RESPONSE: Disputed. While Ms. Best did retire from the City, she continues to perform contract work for them. (Best Dep. 6-7; Crawford Dep. 7).**

78.     Upon Teresa Best's retirement, the City of Maryville, Tennessee chose not to fill her specific position, but instead the City chose to place the leadership of the City Human Resources department under the Assistant City Manager. (Teresa Best Dep., p. 7).

**RESPONSE: Disputed. Ms. Crawford assumed the responsibilities of Ms. Best. (Best**

**Dep. 6-7; Crawford Dep. 7).**

79.     In early to mid-August 2018, Leslie Crawford was promoted to the position of Human Resources Manager. (Leslie Crawford Dep., p. 7).

**RESPONSE: Undisputed.**

80.     The July 22, 2018 memo authored by Kirkland and Kirkland's charge of discrimination filed shortly thereafter contain the same claims of discrimination. (Dep. Exh. 19; Exhibit 3-EEOC Charge of Discrimination; Leslie Crawford Dep. pp. 28-29; 34, 36, 44).

> **RESPONSE. Undisputed that Kirkland authored the memo and filed a charge of discrimination. Disputed as to the contention they contained the exact same claims of discrimination. Ms. Crawford testified that she did not consider all of Kirkland's complaints to be a part of her complaints of discrimination. (Crawford Dep. 30).**

81.     The City of Maryville, Tennessee through their counsel responded to Kirkland's allegations of discrimination on August 27, 2018.  (Exhibit 4-EEOC Position Statement of the City of Maryville, Tennessee).

**RESPONSE: Undisputed.**

82.     On September 19, 2018, Kirkland sent an e-mail to city manager and Leslie Crawford complaining about August 2018 SWAT tryouts within the City of Maryville, Tennessee police department. (Shaina Kirkland Dep., p. 144, Dep. Exh. 23).

> **RESPONSE: Disputed. Kirkland's email to McClain and Crawford complained of continued discrimination since her last communications with HR and filing her EEOC charge. (Kirkland Dep. Ex. 23). This was not simply a complaint regarding SWAT tryouts within the department but specifically a complaint of retaliation since filing her EEOC charge. (Kirkland Dep. Ex. 23).**

83.     Following Kirkland's new allegations of concerns about August 2018 SWAT

tryouts contained in her September 19, 2018 email, Ms. Crawford conferred with the Assistant

City Manager and met with Kirkland in approximately the last week of September, 2018. (Leslie

Crawford Dep., pp. 12-13).

> **RESPONSE: Disputed. The City ignored Kirkland's discrimination complaints and did not take any steps to investigate her claims; instead, she was eventually directed back to the MPD, the very department she filed complained about, to use the department's grievance procedure that Crisp oversaw. (McClain Dep. 17; Best Dep. 15-17; Crisp Dep. 78-80). McClain claims he asked Teresa Best of Human Resources to get involved when he received Kirkland's discrimination complaint to make sure they were following internal processes. (McClain Dep. 17). According to McClain, discrimination claims go to Human Resources for determination. (McClain Dep. 22). Best, the HR Director, testified that the City Manager (Mr. McClain) would most likely assign who should investigate a discrimination claim. (Best Dep. 9). McClain ultimately does not know if anyone conducted an investigation or spoke to Kirkland regarding the complaints she sent to him. (McClain Dep. 23). McClain claims Best determined the complaint needed to go through the MPD grievance process and recalls Best reporting she was talking to Chief Crisp and they were working on it together. (McClain Dep. 25-26). However, Best testified she would have looked to McClain's direction and does not recall being instructed to look into the complaint. (Best Dep. 17). Best does not have any recollection of reviewing Kirkland's memo to McClain and does not know if she ever received her complaint of discrimination. (Best Dep. 16). Crawford (Best's successor as HR Director) recollects that she, along with Campbell, determined Kirkland's September 19, 2018 email was to be filed as a grievance with MPD. (Crawford Dep. 39). Campbell, however, has no recollection of**

**ever seeing the memo Kirkland sent McClain. (Campbell Dep. 16). Crawford testified that Kirkland's email, titled "update to discrimination claims" was not part of the discrimination claims already made; however, she acknowledged that Human Resources is supposed to investigate discrimination claims filed with the City. (Crawford Dep. 14). Further, contrary to Crisp's dictate, Crawford acknowledged the grievance policy was not to be used for complaints of discrimination. (Crawford Dep. 15, 62; Crisp Dep. 29). But, Crawford did inform that her discrimination complaints regarding SWAT tryouts fit into the grievance policy. (Crawford Dep. 15-16). Due to concerns of retaliation, Kirkland did not start the grievance process at that time because she was fearful she would lose her job. (Crawford Dep. 24, 52, Ex. 60).**

84. During the late September 2018 meeting between Ms. Crawford and Kirkland, Kirkland was advised that her new allegations could be properly addressed by submitting them through the City of Maryville, Tennessee grievance process. (Leslie Crawford Dep., p. 13).

**RESPONSE: Undisputed that Ms. Crawford testified as such, disputed that such was the proper procedure. According to McClain, discrimination claims go to Human Resources for determination. (McClain Dep. 22). Best, the HR Director, testified that the City Manager (Mr. McClain) would most likely assign who should investigate a discrimination claim. (Best Dep. 9). McClain ultimately does not know if anyone conducted an investigation or spoke to Kirkland regarding the complaints she sent to him. (McClain Dep. 23). McClain claims Best determined the complaint needed to go through the MPD grievance process and recalls Best reporting she was talking to Chief Crisp and they were working on it together. (McClain Dep. 25-26). However, Best testified she would have looked to McClain's direction and does not recall being**

35

**instructed to look into the complaint. (Best Dep. 17). Best does not have any recollection of reviewing Kirkland's memo to McClain and does not know if she ever received her complaint of discrimination. (Best Dep. 16). Crawford (Best's successor as HR Director) recollects that she, along with Campbell, determined Kirkland's September 19, 2018 email was to be filed as a grievance with MPD. (Crawford Dep. 39). Campbell, however, has no recollection of ever seeing the memo Kirkland sent McClain. (Campbell Dep. 16). Crawford testified that Kirkland's email, titled "update to discrimination claims" was not part of the discrimination claims already made; however, she acknowledged that Human Resources is supposed to investigate discrimination claims filed with the City. (Crawford Dep. 14). Further, contrary to Crisp's dictate, Crawford acknowledged the grievance policy was not to be used for complaints of discrimination. (Crawford Dep. 15, 62; Crisp Dep. 29). But, Crawford did inform that her discrimination complaints regarding SWAT tryouts fit into the grievance policy. (Crawford Dep. 15-16). Due to concerns of retaliation, Kirkland did not start the grievance process at that time because she was fearful she would lose her job. (Crawford Dep. 24, 52, Ex. 60).**

85.     Leslie Crawford spoke with Chief Crisp about Kirkland's concerns as to the SWAT tryouts. At that point in time, Leslie Crawford was already aware of the concerns of City employees concerning Kirkland's attitude and relationships with co-workers. (Leslie Crawford Dep. pp. 23-24).

**RESPONSE: Disputed.  Crisp testified that neither City Manager Greg McClain, nor anyone from Human Resources came to him to investigate Kirkland's complaints. (Crisp. Dep. 84-85). Crisp acknowledged receipt of Kirkland's memos to McClain but, did not ask anyone to investigate her allegations. (Crisp Dep. 84-85). Moreover,**

**Crisp testified that Kirkland violated General Order 2-14 by filing a grievance of discrimination with the City's Human Resources Department rather than following chain of command. (Crisp Dep. 29, Ex. 51, Ex. 58 p. 16 (4/20/19 rated below job standards for not following grievance procedures)).**

86.     On January 23, 2019, Kirkland sends a memo to Chief Crisp titled Grievance. The only factual allegations in the January 23, 2019 that are new that she has not complained of previously are related to the SWAT tryouts in August, 2018. (Shaina Kirkland Dep. pp.145-150; Leslie Crawford Dep., pp. 28-30; Dep. Exh. 24).

**RESPONSE: Undisputed. McClain admitted that the grievance was the result of the initial complaint of discrimination Kirkland sent to him that Human Resources failed to investigate. (McClain Dep. 44). Human Resources did not investigate the grievance alleging discrimination, harassment, hostile work environment, and retaliation, although pursuant to City Rules, such complaints were outside the grievance policy and should be investigated by Human Resources and the City Manager. (Crawford Dep. 56; 59). To her credit, Crawford, doubted the appropriateness of Chief Crisp investigating the claims, including discrimination claims, against him and the police department that were raised in Kirkland's grievance. (Crawford Dep. 57). According to Crawford, a supervisor would not investigate a complaint of which they are the subject. (Crawford Dep. 15). While Chief Crisp was not the subject of the grievance, the allegations of discrimination were against the MPD, of which he is the head. (Crawford Dep. 57-59). Nonetheless, upon receipt of the grievance, Crisp did not start any investigation and did not refer it to internal affairs or HR. (Crisp Dep. 86-87). Instead, based on his first-hand knowledge of everything in Kirkland's grievance, on January 31, 2019, Crisp determined her allegations were without merit. (Crisp Dep.**

**87-88, Ex. 25). Crisp made his determination within a few days of receipt concluding "there are perceptions and reality. Although you perceive that you have been discriminated against, it is my opinion that the facts aren't present to back up this allegation" even though he admitted he did not conduct an investigation, nor did HR. (Crisp Dep. 87, Ex. 25).**

87.     In 2018, Lt. Davis, who is over the SWAT team, mistakenly believed Kirkland was ineligible to tryout due to her probationary status, but later gave Kirkland the tryout date information, explaining to her that she was eligible. Even though arrangements were made for Sgt. Porter to cover Kirkland's shift while she tried out, Kirkland ultimately decided not to tryout of the SWAT team in August 2018. (Shaina Kirkland Dep., pp. 137-138, Dep. Exh. 24; Edward Davis Dep., pp. 16-18; Dep. Exh. 63).

> **RESPONSE: Disputed. Kirkland was not informed Sgt. Porter was scheduled to cover her shift while she tried out for SWAT and it was not until she arrived for work, the same day as the tryout, that she was informed by Sgt. Porter to go home, when previously she had been informed she was needed that day and still remained on the schedule. (Kirkland Dep. Ex. 24).**

88.     To be on the SWAT team, interested officers that wish to apply for SWAT may not do so if they are on employment probation, restricted duty service, or suspension from duty until such time as they are removed from said status. Officers that are interested in applying for SWAT are required to undergo a group tryout process. This process at a minimum, requires:

  a) A physically demanding firearms obstacle course.
  b) Practical firearms drills.
  c) An oral interview with current team members.
  d) Candidates will be required to complete a physical fitness assessment as determined by the SWAT Commander.

(Declaration of Tony Crisp, ¶ 17).

**RESPONSE: Disputed. Despite Kirkland's probation, she was eligible for the SWAT tryouts in 2018. (Davis Dep. 18).**

89.     The SWAT commander has the sole authority to appoint new officers to the SWAT Team with final approval from the Chief of Police. The commander's decision shall be based on overall individual performance during the tryout process. (Declaration of Tony Crisp, ¶ 17).

**RESPONSE: Disputed. Objection as to authenticity and hearsay.  Chief Crisp's declaration does not refer to any City policy and is not the proper source for this information.  Defendant has presented no evidence of any policy regarding appointment of new officers to SWAT other than the self-serving affidavit of Chief Crisp himself. "Without more, self-serving affidavits are insufficient to sustain a motion for summary judgment."** *Jadco Enterprises, Inc, v. Fannon*, **991 F. Supp. 2d 947, 955 (E.D. Ky. 2014). Self-serving affidavits without factual support in the record are insufficient to sustain a motion for summary judgment.** *LNV Corp v. Gebhardt*, **2014 U.S. Dist. LEXIS 34749, at \*11 (E.D. Tenn. Mar. 18, 2014) (Defendant presents no evidence substantiating the claim other than its own affidavits). Affidavits cannot be used to resolve disputed factual issues nor to attack the credibility of the opposing party's witnesses.** *Burley v. Quiroga*, **2019 U.S. Dist. LEXIS 125130 at \*20-21 (E.D. Mich. June 6, 2019) (citing** *10 B Wright & Miller*, **Fed. Prac. & Proc. Civ. Section 2738 (4th ed.)). As credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions. Id. (citing** *Anderson v. Liberty Lobby, Inc*., **477 U.S. 242, 254 (1986).**

**The SWAT commander cannot have sole authority to appoint new officers to the SWAT Team if the decision requires the approval from the Police Chief. In this**

**case, the SWAT commander and Police Chief would both then have authority regarding the appointment of new officers to the SWAT Team.**

90.     Kirkland attempted to try out for the SWAT team one time while employed at the City. (Declaration of Tony Crisp, ¶ 6; Edward Davis Dep., p. 19-20; Dep. Exh. 63).

**RESPONSE: Disputed. Kirkland attempted to try out for the SWAT team twice but was prevented from trying out in 2018 as she was still on the schedule to work the same day as the SWAT tryout. (Kirkland Dep. Ex. 24).**

91.     When she did try out for the SWAT team in 2017, Kirkland failed the firearms obstacle course, part of the required tryout process to be on the SWAT team. (Declaration of Tony Crisp, ¶ 18; Dep. Exh. 64, Kirkland 001575).

**RESPONSE: Undisputed.**

92.     Chief Crisp sends an email to Kirkland on January 28, 2019 regarding her in-service training requirements. In the email, Crisp asks whether Kirkland wants him to see if Sheriff Berrong would reconsider the decision to not allow her to attend training at Blount County Sheriff's Office. The email further states that if Kirkland does not want him to inquire, Kirkland needed to advise Crisp of the in-service training she would be taking to meet her annual requirement. (Shaina Kirkland Dep., p. 150-151, Dep. Exh. 25).

**RESPONSE: Undisputed. Kirkland informed Crisp she would like to go back to in-service, but would leave the decision to contact Sheriff Berrong up to him and if she was allowed to return to Blount County for in-service she would like a MPD supervisor to be in her class due to safety concerns. (Kirkland Dep. 152).**

93.     After submitting her grievance, Shaina Kirkland signed a Grievance Affidavit form stating that she did not want to discuss the complaints made in her January 23, 2019 grievance. (Leslie Crawford Dep., pp. 54-55; Dep. Exh. 60).

**RESPONSE: Undisputed.**

94.     However, in accordance with the policies of the City and general orders of the Maryville police department, on January 30, 2019, Chief Crisp sets a meeting with Kirkland on January 31, 2019 to address her grievance. (Shaina Kirkland Dep., pp. 177,185, Dep. Exh. 40, Kirkland00061; <u>see</u> Leslie Crawford Dep. p. 55).

**RESPONSE: Undisputed.**

95.     Chief Crisp and Captain Moore meet with Kirkland on January 31, 2019 regarding her grievance. On the same day, Crisp sends a memo to Kirkland relating to her grievance. Chief Crisp stated in the written response it is his opinion that the facts are not present to back up her allegation of discrimination. Further, Chief Crisp had already addressed most of the complaints in the grievance with her when she appealed her 3-day suspension. Crisp informed her that she had the right to appeal his decision to the City manager. (Shaina Kirkland Dep., p. 151, Dep. Exh. 26; Tony Crisp Dep., p. 87-88; Declaration of Tony Crisp, ¶ 44).

**RESPONSE: Disputed. While on January 23, 2019, Kirkland filed a grievance with MPD, since the City ignored her initial discrimination complaint, McClain admitted that the grievance was the result of the initial complaint of discrimination Kirkland sent to him that Human Resources failed to investigate. (McClain Dep. 44; Crisp Dep. 85-86, Ex. 24). Human Resources did not investigate the grievance alleging discrimination, harassment, hostile work environment, and retaliation, although pursuant to City Rules, such complaints were outside the grievance policy and should be investigated by Human Resources and the City Manager. (Crawford Dep. 56; 59). To her credit, Crawford, doubted the appropriateness of Chief Crisp investigating the claims, including discrimination claims, against him and the police department that were raised in Kirkland's grievance. (Crawford Dep. 57). According to**

41

**Crawford, a supervisor would not investigate a complaint of which they are the subject. (Crawford Dep. 15). While Chief Crisp was not the subject of the grievance, the allegations of discrimination were against the MPD, of which he is the head. (Crawford Dep. 57-59). Nonetheless, upon receipt of the grievance, Crisp did not start any investigation and did not refer it to internal affairs or HR. (Crisp Dep. 86-87). Instead, based on his first-hand knowledge of everything in Kirkland's grievance, on January 31, 2019, Crisp determined her allegations were without merit. (Crisp Dep. 87-88, Ex. 25). Crisp made his determination within a few days of receipt concluding "there are perceptions and reality. Although you perceive that you have been discriminated against, it is my opinion that the facts aren't present to back up this allegation" even though he admitted he did not conduct an investigation, nor did HR. (Crisp Dep. 87, Ex. 25).**

96.     The City has a policy of anti-discrimination, including a prohibition against harassment based on sex. (Tony Crisp Dep. Exh. 56, pp. 45-46).

**RESPONSE: Undisputed.**

97.     The City also has a policy regarding grievances. (Tony Crisp Dep. Exh. 56, p. 67).

**RESPONSE: Undisputed.**

98.     The City of Maryville followed their policies and addressed Kirkland's complaints at all times relevant. (Leslie Crawford Dep., p. 36, 44, 51).

**RESPONSE: Disputed. Objection, this is not a factual statement, rather goes to the ultimate issue in the matter. The City ignored Kirkland's discrimination complaints and did not take any steps to investigate her claims; instead, she was eventually directed back to the MPD, the very department she filed complained about, to use the**

department's grievance procedure that Crisp oversaw. (McClain Dep. 17; Best Dep. 15-17; Crisp Dep. 78-80). McClain claims he asked Teresa Best of Human Resources to get involved when he received Kirkland's discrimination complaint to make sure they were following internal processes. (McClain Dep. 17). According to McClain, discrimination claims go to Human Resources for determination. (McClain Dep. 22). Best, the HR Director, testified that the City Manager (Mr. McClain) would most likely assign who should investigate a discrimination claim. (Best Dep. 9).

McClain ultimately does not know if anyone conducted an investigation or spoke to Kirkland regarding the complaints she sent to him. (McClain Dep. 23). McClain claims Best determined the complaint needed to go through the MPD grievance process and recalls Best reporting she was talking to Chief Crisp and they were working on it together. (McClain Dep. 25-26). However, Best testified she would have looked to McClain's direction and does not recall being instructed to look into the complaint. (Best Dep. 17). Best does not have any recollection of reviewing Kirkland's memo to McClain and does not know if she ever received her complaint of discrimination. (Best Dep. 16). Crawford (Best's successor as HR Director) recollects that she, along with Campbell, determined Kirkland's September 19, 2018 email was to be filed as a grievance with MPD. (Crawford Dep. 39). Campbell, however, has no recollection of ever seeing the memo Kirkland sent McClain. (Campbell Dep. 16). Crawford testified that Kirkland's email, titled "update to discrimination claims" was not part of the discrimination claims already made; however, she acknowledged that Human Resources is supposed to investigate discrimination claims filed with the City. (Crawford Dep. 14). Further, contrary to Crisp's dictate, Crawford acknowledged the grievance policy was not to be used for

complaints of discrimination. (Crawford Dep. 15, 62; Crisp Dep. 29). But, Crawford did inform that her discrimination complaints regarding SWAT tryouts fit into the grievance policy. (Crawford Dep. 15-16). Due to concerns of retaliation, Kirkland did not start the grievance process at that time because she was fearful she would lose her job. (Crawford Dep. 24, 52, Ex. 60).

Contrary to Policy, the City did not conduct <u>any</u> formal investigation of Kirkland's complaints of discrimination following her September 22, 2018 email to McClain. (Ex. 56 pp. 1010-11). Crisp testified that neither City Manager Greg McClain, nor anyone from Human Resources came to him to investigate Kirkland's complaints. (Crisp. Dep. 84-85). Crisp acknowledged receipt of Kirkland's memos to McClain but, did not ask anyone to investigate her allegations. (Crisp Dep. 84-85). Moreover, Crisp testified that Kirkland violated General Order 2-14 by filing a grievance of discrimination with the City's Human Resources Department rather than following chain of command. (Crisp Dep. 29, Ex. 51, Ex. 58 p. 16 (4/20/19 rated below job standards for not following grievance procedures)).

The City Policy states that they will promptly investigate claims of discrimination. (Best Dep. 18-19; Ex. 56 pp. 1010-11). McClain acknowledges it would be a violation of the City's policies if Kirkland's claim was dropped and nothing was done with it. (McClain Dep. 35). He further admitted that if nothing happened within a six-month period after Kirkland's complaints that such inaction would not be appropriate. (McClain Dep. 36). Best, the Director of Human Resources for the City, does not know if Kirkland's claims were investigated, in part because she was in the

process of retiring, although she did hand the file off to Crawford.[1] (Best Dep. 6-7, 19, 24; Crawford 7-8). Campbell testified the City has a form for investigation documentation. (Campbell Dep. 17). If Human Resources investigated Kirkland's discrimination claims, there should be documentation in the City's files, but there was none, and the City failed to produce the form. (Campbell Dep. 17).

On January 23, 2019, Kirkland filed a grievance with MPD, since the City ignored her initial discrimination complaint. (Crisp Dep. 85-86, Ex. 24). McClain admitted that the grievance was the result of the initial complaint of discrimination Kirkland sent to him that Human Resources failed to investigate. (McClain Dep. 44). Human Resources did not investigate the grievance alleging discrimination, harassment, hostile work environment, and retaliation, although pursuant to City Rules, such complaints were outside the grievance policy and should be investigated by Human Resources and the City Manager. (Crawford Dep. 56; 59). To her credit, Crawford, doubted the appropriateness of Chief Crisp investigating the claims, including discrimination claims, against him and the police department that were raised in Kirkland's grievance. (Crawford Dep. 57). According to Crawford, a supervisor would not investigate a complaint of which they are the subject. (Crawford Dep. 15). While Chief Crisp was not the subject of the grievance, the allegations of discrimination were against the MPD, of which he is the head. (Crawford Dep. 57-59). Nonetheless, upon receipt of the grievance, Crisp did not start any investigation and did not refer it to internal affairs or HR. (Crisp Dep. 86-87). Instead, based on his first-hand knowledge of everything in Kirkland's grievance, on January 31, 2019,

---

[1] Crawford has no experience investigating complaints of discrimination. (Crawford Dep. 8).

**Crisp determined her allegations were without merit. (Crisp Dep. 87-88, Ex. 25). Crisp made his determination within a few days of receipt concluding "there are perceptions and reality. Although you perceive that you have been discriminated against, it is my opinion that the facts aren't present to back up this allegation" even though he admitted he did not conduct an investigation, nor did HR. (Crisp Dep. 87, Ex. 25).**

99.    Kirkland did not communicate any of her complaints concerning her employment with the City to any elected official. (Shaina Kirkland Dep., p. 206).

**RESPONSE: Undisputed.**

100.    On February 4, 2019, Kirkland responds to Chief Crisp's January 28, 2019 e-mail, stating that she would like to go back to in-service training at the Blount County Sheriff's Office but would leave the decision up to Chief Crisp regarding whether to contact Sheriff Berrong. (Shaina Kirkland Dep., p. 152-153, Dep. Exh. 27).

**RESPONSE: Undisputed.**

101.    Chief Crisp sends a letter to Sherriff Berrong on February 6, 2019, asking him to re-consider his decision to not let Kirkland attend in-service training at the Blount County Sheriff's Office. (Shaina Kirkland Dep., p. 153, Dep. Exh. 28).

**RESPONSE: Undisputed.**

102.    On February 13, 2019, Chief Crisp received an e-mail complaint from citizen, Tim Carringer, regarding his interaction with Kirkland. (Shaina Kirkland, Dep. p. 154, Dep. Exh. 29).

**RESPONSE: Disputed. On February 13, 2019, Tim Carringer wrote an email to Chief Crisp regarding a "female officer" who took a report on a missing handgun and asked him how he knew the handgun was missing. (Kirkland Dep. Ex. 29). The email subject**

**is "Customer Feedback." (Id.) The email does not list Kirkland by name nor does it state it is a complaint.**

103.     Sheriff Berrong sends a letter on February 20, 2019 to Chief Crisp declining to reconsider his decision to prohibit Kirkland from attending training at the Blount County Sheriff's Office. (Shaina Kirkland Dep., p. 154-155, Dep. Exh. 30).

**RESPONSE: Undisputed.**

104.     Neither Chief Crisp nor any other City of Maryville employee was involved in Sheriff Berrong's decision to ban Kirkland from Blount County Sheriff Department's 2019 in-service training. (James Berrong Dep. pp. 18, 20).

**RESPONSE: Disputed that the statement fairly characterizes the testimony. Sherriff Berrong testified that the did not have a conversation with Chief Crisp about his decision and that Chief Crisp did not call him. (Berrong Dep. 18). He did not testify regarding any involvement of anyone in the decision. Id. On the contrary, Chief Crisp testified that he did have a discussion with Sheriff Berrong about the decision to ban Kirkland from BCSO. (Crisp Dep. 65).**

105.     On March 3, 2019, Kirkland sends an e-mail to Chief Crisp, requesting the letters sent between Chief Crisp and Sheriff Berrong relating to Berrong reconsidering his decision to prohibit Kirkland from attending training at the Blount County Sheriff's Office.  Chief Crisp sends Kirkland the requested documents the next day.  (Shaina Kirkland Dep., p 155-156, Dep. Exh. 31).

**RESPONSE: Undisputed.**

106.     Kirkland posts on Facebook "Shania Kirkland is feeling cozy… Just like I'm sure it's not illegal to ban a female officer from training for not voting for you either…" linking an article to The Daily Times "Sheriff's connections to private contractor are cozy, but lawyer says not illegal" on May 13, 2019. (Shaina Kirkland Dep., p. 156-161, Dep. Exh. 32).

**RESPONSE: Undisputed.**

107. On May 16, 2019, Chief Crisp sends a memo to Assistant City Manager Roger Campbell recommending dismissal of Kirkland after numerous policy violations by Kirkland. (Shaina Kirkland Dep., p. 163, Dep. Exh. 33).

**RESPONSE: Undisputed.**

108. The complaints regarding the Plaintiff from the public and fellow officers led to significant disruption at the police department. (Tony Jay Crisp Dep., p. 44, 55).

**RESPONSE: Disputed that the testimony supports the factual contention. Chief Crisp testified that Ms. Kirkland was not eligible for rehire due to interruption and disruption of the department; he did not testify that complaints from the public and fellow officers led to significant disruption. Rather, he testified, "over and over counseling with her and different terms of the disciplinary actions against her, that her behavior [in complaining] continued. It [the behavior of complaining] performed such a disruption in the services that we deliver that I removed her from – but with pay." Here, he was testifying regarding Officer Kirkland's complaints about the City's discriminatory treatment of her causing a disruption, and that he suspended her with pay, not terminated her. (Berrong Dep. 55).**

109. Assistant City Manager Roger Campbell sends a memo to Kirkland regarding Chief Crisp's recommendation and her opportunity to request a pre-disciplinary hearings should she so choose. (Shaina Kirkland Dep., p. 165, Dep. Exh. 34).

**RESPONSE: Undisputed.**

110. Shaina Kirkland did request a pre-disciplinary hearing in front of Assistant City Manager Roger Campbell. (Shaina Kirkland Dep., p. 165).

**RESPONSE: Undisputed.**

111.     The pre-disciplinary hearing requested by Kirkland took place. On May 20, 2019 Assistant City Manager Roger Campbell sends a memo upholding the termination recommendation of Chief Crisp. (Shaina Kirkland Dep., p. 165-167, Dep. Exh. 35).

**RESPONSE: Undisputed.**

112.     Kirkland requests a hearing to appeal the decision of Assistant City Manager Roger Campbell pertaining to Chief Crisp's recommendation to terminate Kirkland. An appeal hearing was held in front of City Manager Greg McClain on May 28, 2019. (Shaina Kirkland Dep., p. 167).

**RESPONSE: Undisputed.**

113.     After the hearing, Greg McClain spoke with Captain David Graves, Chief Crisp, and Human Resources in investigating whether Kirkland should be terminated. (Greg McClain Dep. p. 47).

**RESPONSE: Disputed that the cited testimony supports the factual contention. McClain testified that he met with Chief Crisp and Captain Graves. He did not note having a conversation with Human Resources, but is sure he did. (McClain Dep. 47-48). He did not testify that he investigated whether Ms. Kirkland should be terminated.**

114.     Greg McClain sends a memo to Kirkland affirming the recommendation and decision to terminate her employment, effective May 21, 2019. (Shaina Kirkland Dep., p. 168, Dep. Exh. 36).

**RESPONSE: Undisputed.**

## ADDITIONAL STATEMENT OF FACTS

1.     Kirkland is employed by the City of Maryville, in its Police Department, which has no relation to the County Sheriff's Department. (Crisp Dep. Ex. 47).

**RESPONSE:**

2.     The Maryville Police Department ("MPD") follows the City of Maryville's Personnel Rules and Procedures ("City Rules") and its own policies and procedures referred to as "General Orders." (Crisp Dep. 14-15).

**RESPONSE:**

3.     The City Rules state in part that no current or prospective City employee "shall be employed, demoted or discharged, or in any way favored or discriminated against **because of political opinion or affiliation**, race, color, religion, national origin, sex, disability, age, or veteran's or reservist's status." (Crisp Dep. 35-36, Ex. 56 p. 000965 (emphasis added)).

**RESPONSE:**

4.     General Order 2-3 governs recruitment by MPD and contains an Equal Employment Opportunity measure. (Crisp Dep. 18-19, Ex. 48). All complaints of discrimination are to be promptly investigated. (Ex. 56 p. 1010-1011).

**RESPONSE:**

5.     The City Rules recognize an employee may participate in political activities and support or oppose political candidates. (Crisp Dep. 50-51, Ex. 56 p. 001017; Best Dep. 15).

**RESPONSE:**

6.     General Order 2-10 provides guidelines for the use of social media by MPD members, including personal use of social media. (Crisp Dep. Ex. 49 p. 000477). Specifically, MPD members "are free to express themselves as private citizens while using social media" as long as such expression does not negatively affect the public's perception of MPD and are further cautioned on

how their speech and social media activity may reflect upon MPD. (Crisp Dep. Ex. 49 p. 000477).

**RESPONSE:**

7.      General Order 2-14 establishes Grievance Procedures applicable to "points of misunderstanding or disagreement that arise between employees and their supervisors." (Crisp Dep. Ex. 51 p. 000490). Pursuant to General Order 2-14, an employee shall notify his or her immediate supervisor in writing of a grievance.  (Crisp Dep. Ex. 51 p. 000490).

**RESPONSE:**

8.      the City Rules set forth complaint procedures regarding discrimination and harassment. (Crisp Dep. 48, Ex. 56 p. 001010). The City Rules provide that an employee has the right to circumvent the chain of command for discrimination complaints; this provision applies to MPD as well. (Crisp. Dep. 48-49, Ex. 56 p. 001010). However, contrary to policy, Chief Crisp expects all complaints within the MPD to go through the chain of command and ultimately through him rather than to the City's Human Resources Department, even if the employee is uncomfortable talking to him. (Crisp Dep. 16-18).

**RESPONSE:**

9.      General Order 2-15 applies to disciplinary procedures and provides for a range of consequences for failure to follow General Orders ranging in severity from written reprimand to dismissal, depending in part on the class of order violated. (Crisp Dep. 30, Ex. 52). Class C is considered the least serious, with a Class A violation being the most serious and it includes termination. (Crisp Dep. 31, Ex. 52 p. 492). Anything that arises to a "serious complaint" should be referred to internal affairs. (Crisp Dep. 28). If an employee is suspended for less than 5 days, it is a fair assumption that is only a Class C violation. (Crisp Dep. 31).

**RESPONSE:**

10.      In 2014, Kirkland was rated 3-5 ("good" to "excellent") in all categories evaluated

with an overall score in the "very good" range after her first year of being a full-time officer. (Crisp Dep. 57, Ex. 58 pp. 1-5). She was regarded as a hard worker, who would "readily volunteer for assignments and regularly turns out more than the normal workload expected of her" (Crisp Dep. Ex. 58 p. 1); and "she is a team player, works well with other officers and continues to be a very good employee with the department. She has also tried to improve herself on a daily basis to become a better officer. She is still in the 'learning' curve of police work, but has done well in taking advice, etc. from senior officers and supervisors." (Crisp Dep. Ex. 58 p. 5).

**RESPONSE:**

11.    Kirkland's 2015 Evaluation contained 4's and 5's in all but one category, with her overall performance marked as "very good". (MSJ Ex. 1, March 28, 2015 Employee Performance/Achievement Expectations). Kirkland was praised for being the "most active officer on day shift" and "approach[ing] her daily routine in a professional manner…[with] a 'can do' attitude." (Id.). Kirkland adapted well to changes in the department and "never questions the decision making process of said changes." (Id.). She served on a committee of officers within the department to identify and address issues and challenges within the department. (Id.). Kirkland received a 5, the top rating, in the teamwork category, with comments that she was very popular amongst her colleagues adapting well to day shift and its members, which her supervisor found "impressive" given that day shift was mostly senior officers within the department. (Id.). The evaluating supervisor stated: "Now, after completing her second year of service and gaining a considerable amount of knowledge and comfort in her job duties, this supervisor would like to see Shaina branch out within the department and assume roles on specialized teams and request more specialized training opportunities to further advance her career." (MSJ Ex. 1).

**RESPONSE:**

12.    In Kirkland's 2016 Evaluation, she scored 3-5 in every category, with an overall score

of "very good." (MSJ Ex. 2, March 27, 2016 Employee Performance/Achievement Expectations). Her supervisor commented that she was a "solid officer" on the shift and, praised her written reports, commenting "It is a very rare occasion when I have to request a revision to a report written by Officer Kirkland. She gathers the information required at the scene and writes a very good detailed narrative." (MSJ Ex. 2). It was also noted she "generally gets along with other officers and citizens alike." (MSJ Ex. 2). Kirkland received annual merit raises throughout her employment. (Crisp Dep. 58-59). In addition to her evaluations, Kirkland was viewed favorably by peers. (Weiss Decl. ¶¶ 3-5; Crisp Ex. 57).

**RESPONSE:**

13.    In September 2017, Kirkland was acting as a Field Training Officer for a female trainee. (Kirkland Dep. 81-87). In discussing her experience at the department, Kirkland stated she had applied for the Traffic Unit and other special assignments and had been passed over for male officers and made an off-hand comment about uniform boots. (Kirkland Dep. 81-87, Ex. 7 p. 3).

**RESPONSE:**

14.    On October 10, 2017, Captain Sharon Moore issued a Written Reprimand to Kirkland disciplining her for raising concerns that she was discriminated against based on her gender and the off-hand boot comment. (Moore Dep. 17-22, Ex. 8; Kirkland Dep. 86-87). Specifically, Kirkland was reprimanded for stating MPD "isn't a good department to work for if you are female," and her concern that she had been passed up for special assignments in the past due to her gender; her concerns were characterized as negativity toward the department that would not be tolerated, and she was indefinitely suspended from her duties as a Field Training Officer. (Moore Dep. 21, Ex. 8). Kirkland was warned she was to immediately refrain from speaking negatively about the department and decisions made by the Chief. (Moore Dep. Ex. 8).

**RESPONSE:**

15.     Chief Crisp was made aware that Kirkland made complaints that MPD was not good to work for as a female and perceived she was passed over for special assignments because she was female in 2017. (Crisp Dep. 101-102).

**RESPONSE:**

16.     Even though the MPD was aware of Kirkland's discrimination concerns, Kirkland was not referred to Human Resources for investigation or counseling due to the discrimination concerns she raised. (Moore Dep. 19, 21).

**RESPONSE:**

17.     Officer Weiss experienced similar discrimination that she felt was based on her gender while at MPD. (Weiss Decl. ¶¶ 20, 27-29; Weiss Dep. 70, 86).

**RESPONSE:**

18.     In February 2018, Kirkland re-posted a video from a local news station on her personal facebook page of Blount County sheriff candidate, Sheriff Berrong, commenting "Embarrassing!!! This is a leader?? I personally prefer one that can actually speak to people."[2] (Kirkland Dep. 91-95, 9-1).

**RESPONSE:**

19.     On February 12, 2018, Captain David Graves reprimanded Kirkland for her personal social media post about the County Sheriff because it was "negative" rather than supportive, even though the City's policies specifically protect opposition. (Kirkland Dep. 91-92, Ex. 9-1; Crisp Dep. Ex. 56 p. 1017).

**RESPONSE:**

20.     Kirkland was the only MPD employee who openly did not support Sheriff Berrong's

re-election. (Crisp Dep. 41, 46).

**RESPONSE:**

21.     Although Chief Crisp testified that MPD does not monitor its officers' social media use, he also testified that only Kirkland exclusively was disciplined for her social media use in the last five years. (Crisp Dep. 24, 46).

**RESPONSE:**

22.     April 20, 2018, Kirkland was still rated in the "good" category with very little additional comment in her performance evaluation. (Crisp Dep. Ex. 58, pp. 10-13). It was also noted she was working well with her co-workers. (Crisp Dep. Ex. 58, p. 12).

**RESPONSE:**

23.     From May 28 to June 1, 2018, Kirkland attended an in-service training at the training academy at the Blount County Sheriff's Office ("BCSO"). (Kirkland Dep. 100-102, Ex. 13). Prior to the training, Kirkland expressed to her supervisor, Captain David Graves, she was concerned about retaliation from some of the sheriff's deputies related the election and her vocal support of the candidate running against Berrong. (Graves Dep. 18). Captain Graves acknowledged Kirkland had let him know about incidents in which Sheriff's deputies Doug Moore and Scotty Boyd got up on her bumper when she was driving. (Graves Dep. 20; Kirkland Dep. Ex. 39).

**RESPONSE:**

24.     Around February 4, 2018, Scotty Boyd (at the Sheriff's Department) made a comment that people who supported Berrong's opponent were "kool-aid drinking wormy sacks of garbage" and "whiny disgruntled babies." (Kirkland Dep. 176, Ex. 39 p. 0005).

**RESPONSE:**

25.     On February 7, 2018, Kirkland was directly threatened on a political message board that "bashing the current sheriff is career suicide" and that "you don't burn bridges." (Kirkland Dep.

Ex. 39 p. 0006).

**RESPONSE:**

26.     Despite Kirkland's concerns, Graves did not make any report regarding her complaints of harassment from the Sheriff's deputies and he told Kirkland she had to go to the in-service, but if something was said to her directly to record it with her phone and let him know. (Graves Dep. 18, 20; Kirkland Dep. 181-182).

**RESPONSE:**

27.     There is no requirement that MPD officers receive in-service training from BCSO. (Moore Dep. 10-11; Kirkland Dep. 186).

**RESPONSE:**

28.     On May 29, 2018, while at the BCSO in-service, Kirkland was selected to participate in a training exercise involving a high stress situation requiring rescue of an officer down and ambush by gunfire. (Kirkland Depo. 100-101, Ex. 10; Crisp Dep. 67, Ex. 13).

**RESPONSE:**

29.     In the exercise, where all trainees were wearing simunition helmets, Kirkland was selected to be the driver of an SUV during the exercise and other officers were yelling at her to "go, go, go;" while the trainee playing the part of the downed suspect was lying in front of the SUV being driven by Kirkland. (Ex. 13). It was then reported this person lying in front of the SUV was almost run over. (Kirkland Dep. Ex. 13). Despite being yelled at to "go, go, go" Kirkland stopped the SUV when instructors commanded her to do so and no one was harmed. (Id; Crisp Dep. 67).

**RESPONSE:**

30.     On June 1, 2018, Investigator Paul Grady of BCSO extended his hand to Kirkland who responded by saying "No, thank you" and did not shake his hand. (Kirkland Dep. 105, Ex. 11). Kirkland did not shake his hand because of the way she perceived she was being treated at the

training by BCSO deputies and Grady's social media behavior that she found offensive. (Kirkland Dep. 181-182, Ex. 13, p. 2).

**RESPONSE:**

31.     Grady was subsequently asked to send a memo to Sheriff Berrong on June 4, 2018, documenting the incident with Kirkland. (Kirkland Dep. 105, Ex. 11; Berrong Dep. 12-13; Crisp Dep. Ex. 12).

**RESPONSE:**

32.     On June 4, 2018, Sheriff Berrong advised Chief Crisp that Kirkland was no longer welcome at training held by BCSO because she declined to shake Grady's hand and the training exercise where she was accused of handling herself in an "unsafe manner." (Crisp Dep. 64-65, Ex. 12 p. 2; Berrong Dep. 12-13).

**RESPONSE:**

33.      Berrong stated that because Kirkland was "coming into their house" for training, she was blatantly disrespectful when she declined to shake hands. (Berrong Dep. 17). No other officers were disciplined for the training exercise. (Berrong Dep. 11). However, Berrong was certain other officers have almost been injured in training exercises and could not recall another officer being banned from training. (Berrong Dep. 13).

**RESPONSE:**

34.     MPD has no "hand shaking policy." (Crisp Dep. 63. *C.f.* Best Dep. 15 (does not recall any other City employee being suspended for not shaking a hand)). Chief Crisp made the decision to suspend Kirkland without asking her why she refused to shake Grady's hand. (Crisp Dep. 65-66).

**RESPONSE:**

35.     On June 8, 2019, after investigating the incidents involving Kirkland at the BSCO training, Captain Moore recommended reprimand because it was a dangerous situation and based on

the "totality of the situation" a three-day suspension without pay was recommended. (Crisp Dep.67; Moore Dep. 29-30, 32, Ex. 13 p. 2). In doing so, Moore brought up Kirkland's political opinions on her social media account and the 2017 reprimand where Kirkland complained about the way female officers were treated. (Moore Dep. Ex. 13).

**RESPONSE:**

36. On June 26, 2018, Chief Crisp sent his recommendation to suspend Kirkland without pay to Assistant City Manager Roger Campbell due to Kirkland's "attitude and ability to get along with others," her "blatant disrespect for [BCSO's] instructors and deputies" and handling herself in an unsafe manner in the training exercise. (Crisp Dep. 71, Ex. 14). There were no facts to support wide-spread disrespect or that Kirkland was disrespectful to multiple people at the BCSO training. (Id.).

**RESPONSE:**

37. Crisp recognized he did not meet with Berrong about Kirkland because he did not feel it rose to the level of a serious policy or procedural problem. (Crisp Dep. 34).

**RESPONSE:**

38. Kirkland was suspended without pay July 23-26, 2018 for the non-serious hand shaking incident. (Kirkland Dep. Ex. 18; Crisp Dep. 34).

**RESPONSE:**

39. On July 22, 2018, Kirkland sent a memo to Greg McClain, City Manager, and Teresa Best advising City administration of her "Discrimination Claims." (Kirkland Dep. Ex. 19; Best Dep. 16 (can't recall receiving); McClain Dep. 22-23 (recalls giving to Best); Crawford Dep. 17 (saw when transitioning to Best's role)). In her Memo, Kirkland expressed her belief that she had been discriminated against on the basis of her gender, setting forth in detail her multiple applications to the traffic unit, request for the rank of Corporal, application for the Fifth Judicial Drug Task Force,

try out for the SWAT team, the 2017 reprimand where she spoke out about females being treated differently, inappropriate notes left in her mailbox, and the BCSO training week incidents, including that she had brought issues of retaliation to Captain Graves' attention to no avail. (Ex. 19). All of which led Kirkland to conclude she was being subjected to a hostile work environment and expressed her belief that she was being retaliated against for talking about discrimination. (Ex. 19).

**RESPONSE:**

40.    On July 26, 2018, Kirkland filed an EEOC Charge alleging discrimination and retaliation. (Best Dep. Ex. 59).

**RESPONSE:**

41.    On September 19, 2018, Kirkland sent an additional email to McClain and Crawford titled "update to discrimination claims." (Kirkland Dep. Ex. 23). Kirkland informed McClain of further discrimination regarding SWAT tryouts, expressing a claim that she was not timely informed of the tryout information despite signing up for it and retaliation in the wake of her EEOC charge. (Kirkland Dep. Ex. 19, 23). On August 9, 2018, Kirkland discovered she had not received a letter with information for the SWAT tryouts scheduled for August 18, 2018, and followed up with her supervisor, Lt. Davis, who told informed Kirkland she was not eligible for SWAT tryouts due to the recent suspension. (Kirkland Dep. Ex. 19). Kirkland showed Davis the General Orders on discipline and SWAT qualifications, which did not contain any indication she would be ineligible. (Ex. 19). Kirkland informed her immediate supervisor, Sgt. Porter, that she was the only female to sign up and the only individual not permitted to try out. (Ex. 19). On August 14, 2018, Davis finally provided Kirkland the information about SWAT tryouts and told her she could tryout if she was still interested. (Ex. 19). Kirkland was still scheduled to work on the same day as the tryouts and did not think it would be safe to go through the tryout then work a full shift, so she was unable to attend tryouts; however, two men on her shift who tried out were not scheduled to work the date of tryouts. (Ex.

19). In her update to McClain and Crawford, Kirkland made them aware that other officers had been warned about dealing with her because she had filed a lawsuit (even though she had not at that time). (Ex. 19 p. 0089).

**RESPONSE:**

42.     The City did not take any steps to investigate Kirkland's discrimination claims that she sent to HR and City Administrators; instead, she was eventually directed back to the MPD to use the department's grievance procedure that Crisp oversaw. (McClain Dep. 17; Best Dep. 15-17; Crisp Dep. 78-80).

**RESPONSE:**

43.     McClain claims he asked Teresa Best of Human Resources to get involved when he received Kirkland's discrimination complaint to make sure they were following internal processes. (McClain Dep. 17). According to McClain, discrimination claims go to Human Resources for determination. (McClain Dep. 22).

**RESPONSE:**

44.     Best, the HR Director, testified that the City Manager (Mr. McClain) would most likely assign who should investigate a discrimination claim. (Best Dep. 9). McClain ultimately does not know if anyone conducted an investigation or spoke to Kirkland regarding the complaints she sent to him. (McClain Dep. 23).

**RESPONSE:**

45.      McClain claims Best determined the complaint needed to go through the MPD grievance process and recalls Best reporting she was talking to Chief Crisp and they were working on it together. (McClain Dep. 25-26).

**RESPONSE:**

46.     Best testified she would have looked to McClain's direction and does not recall being

instructed to look into the complaint. (Best Dep. 17). Best does not have any recollection of reviewing Kirkland's memo to McClain and does not know if she ever received her complaint of discrimination. (Best Dep. 16).

**RESPONSE:**

47.     Crawford (Best's successor as HR Director) recollects that she, along with Campbell, determined Kirkland's September 19, 2018 email was to be filed as a grievance with MPD. (Crawford Dep. 39). Campbell, however, has no recollection of ever seeing the memo Kirkland sent McClain. (Campbell Dep. 16). Crawford testified that Kirkland's email, titled "update to discrimination claims" was not part of the discrimination claims already made; however, she acknowledged that Human Resources is supposed to investigate discrimination claims filed with the City. (Crawford Dep. 14).

**RESPONSE:**

48.     Crawford acknowledged the grievance policy was not to be used for complaints of discrimination. (Crawford Dep. 15, 62; Crisp Dep. 29). Crawford did inform Kirkland that her discrimination complaints regarding SWAT tryouts fit into the grievance policy. (Crawford Dep. 15-16). Due to concerns of retaliation, Kirkland did not start the grievance process at that time because she was fearful she would lose her job. (Crawford Dep. 24, 52, Ex. 60).

**RESPONSE:**

49.     Contrary to Policy, the City did not conduct **any** formal investigation of Kirkland's complaints of discrimination following her September 22, 2018 email to McClain. (Ex. 56 pp. 1010-11).

**RESPONSE:**

50.     Crisp testified that neither City Manager Greg McClain, nor anyone from Human Resources came to him to investigate Kirkland's complaints. (Crisp. Dep. 84-85).

**RESPONSE:**

51.     Crisp acknowledged receipt of Kirkland's memos to McClain but, did not ask anyone to investigate her allegations. (Crisp Dep. 84-85).

**RESPONSE:**

52.     Crisp testified that Kirkland violated General Order 2-14 by filing a grievance of discrimination with the City's Human Resources Department rather than following chain of command. (Crisp Dep. 29, Ex. 51, Ex. 58 p. 16 (4/20/19 rated below job standards for not following grievance procedures)).

**RESPONSE:**

53.     Per City Policy an employee can circumvent their chain of command. (Crisp Dep. 49, Ex. 56 p. 1010).

**RESPONSE:**

54.     The City Policy states that they will promptly investigate claims of discrimination. (Best Dep. 18-19; Ex. 56 pp. 1010-11). McClain acknowledges it would be a violation of the City's policies if Kirkland's claim was dropped and nothing was done with it. (McClain Dep. 35). He further admitted that if nothing happened within a six month period after Kirkland's complaints that such inaction would not be appropriate. (McClain Dep. 36).

**RESPONSE:**

55.     Best does not know if Kirkland's claims were investigated, in part because she was in the process of retiring, although she did hand the file off to Crawford.[3] (Best Dep. 6-7, 19, 24; Crawford 7-8).

**RESPONSE:**

---

[3] Crawford has no experience investigating complaints of discrimination. (Crawford Dep. 8).

56.     Campbell testified the City has a form for investigation documentation. (Campbell Dep. 17). If Human Resources investigated Kirkland's discrimination claims, there should be documentation in the City's files, but there was none, and the City failed to produce the form. (Campbell Dep. 17).

**RESPONSE:**

57.     On January 23, 2019, Kirkland filed a grievance with MPD, since the City ignored her initial discrimination complaint. (Crisp Dep. 85-86, Ex. 24).

**RESPONSE:**

58.     Human Resources did not investigate the grievance alleging discrimination, harassment, hostile work environment, and retaliation, although pursuant to City Rules, such complaints were outside the grievance policy and should be investigated by Human Resources and the City Manager. (Crawford Dep. 56; 59).

**RESPONSE:**

59.     Crawford, doubted the appropriateness of Chief Crisp investigating the claims, including discrimination claims, against him and the police department that were raised in Kirkland's grievance. (Crawford Dep. 57).

**RESPONSE:**

60.     A supervisor should not investigate a complaint of which they are the subject. (Crawford Dep. 15). While Chief Crisp was not the subject of the grievance, the allegations of discrimination were against the MPD, of which he is the head. (Crawford Dep. 57-59).

**RESPONSE:**

61.     On January 31, 2019, Crisp determined her allegations were without merit. (Crisp Dep. 87-88, Ex. 25). Crisp made his determination within a few days of receipt concluding "there are perceptions and reality. Although you perceive that you have been discriminated against, it is my

opinion that the facts aren't present to back up this allegation" even though he admitted he did not conduct an investigation, nor did HR. (Crisp Dep. 87, Ex. 25).

**RESPONSE:**

62.     On May 16, 2019, Crisp recommended Kirkland's termination in a Memo to Assistant City Manager Campbell. (Crisp Dep. 94, Ex. 33). Crisp stated that on May 13, 2019, it was brought to his attention by a MPD employee that Kirkland made a derogatory comment on her personal Facebook account. (Crisp Dep. 92, 94, Ex. 33).

**RESPONSE:**

63.     Kirkland reposted a newspaper article about Sheriff Berrong, in which it was noted he had connections to a private contractor and commented, "Just like I'm sure it's not illegal to ban a female officer from training, for not voting for you either." (Crisp Dep. 94, Ex. 32, 33; Kirkland Dep. 160).

**RESPONSE:**

64.     Only Crisp made the recommendation to terminate. (Crawford Dep. 40).

**RESPONSE:**

65.     McClain did not consider whether other employees made similar posts on social media but, acknowledged he has not been involved in any other discipline or termination based on employee's social media activity. (McClain Dep. 49).

**RESPONSE:**

66.     City Policy governs over departmental procedure if there is conflict. (McClain Dep. 50-51, Ex. 56 p. 1035).

**RESPONSE:**

67.     Kirkland was not ever referred to internal affairs for a serious complaint. (Crisp Dep. 27). Prior to her termination, Crisp announced in a supervisor meeting that Kirkland had filed a

complaint of discrimination with a federal agency and they were expecting a lawsuit. (Graves Dep. 15-16).

**RESPONSE:**

68.	Kirkland suffered further retaliation by MPD after her termination. She applied for law enforcement jobs at multiple agencies. (Kirkland Dep. 47-48).

**RESPONSE:**

69.	Despite the City's practice to only verify dates of employment and title through the Human Resources Department, Crisp spoke to a member of at least one police department regarding Kirkland dissuading them from hiring her for her protected activity. (Crisp Dep. 21-23; McClain Dep. 57; Best Dep. 26-27; Crawford Dep. 43). For example, Crisp informed the Venore Police Department that Kirkland had been terminated and that she had filed a lawsuit against him. (Crisp Dep. 21-23).

**RESPONSE:**

70.	McClain acknowledged they did not give details like this because it risks the City to litigation and injures someone's opportunity to find a job. (McClain Dep. 57).

**RESPONSE:**

71.	After raising concerns of bias and discrimination, Officer Weiss experienced retaliation as well. (Weiss Decl. ¶¶14, 19, 23; Weiss Dep. 55, 57-58).

**RESPONSE:**

Respectfully submitted,

*/s Heather Moore Collins*
Heather Moore Collins BPR # 026099
Anne Hunter BPR # 022407
Collins & Hunter PLLC
7000 Executive Center Dr., Suite 320
Brentwood, TN 37027
615-724-1996
615-691-7019 FAX
heather@collinshunter.com
anne@collinshunter.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY certify that a copy of the foregoing has been served this 4th day of January 2021 through the court's CM/ECF system to: Reid Spaulding, Courtney Read, Watson, Roach, Batson & Lauderback PLC, P.O. Box 131, Knoxville, TN 37901-0131.

*s/ Heather Moore Collins*